No. 25-11890

In the
**United States Court of Appeals**
for the
**Eleventh Circuit**

_____

Michael Wade Nance,
*Plaintiff/Appellant*

vs.

Tyrone Oliver, et al.,
*Defendants/Appellees*

on Appeal from the United States District Court
Northern District of Georgia

────────────────────────────────

**APPELLANT'S BRIEF**

────────────────────────────────

Matt Friedlander
Webb Daniel
Friedlander LLP
75 14th St. NE,
Suite 2450
Atlanta, GA 30309
(414) 712-0282

Anna Arceneaux
Victoria Olender
Hellstrom
Georgia Resource
Center
104 Marietta St. NW,
Suite 260
Atlanta, GA 30303
(404) 222-9202

Cory Isaacson
Andrés López-Delgado
American Civil Liberties
Union Foundation of
Georgia
P.O. Box 570738,
Atlanta, GA 30357
(770) 415-5490

*Attorneys for Plaintiff-Appellant Michael Wade Nance*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Counsel hereby certifies that the following have an interest in the outcome of this case:

1. American Civil Liberties Union Foundation of Georgia, Counsel for Appellant

2. Arceneaux, Anna, Counsel for Appellant

3. Baker Hostetler, LLP, Counsel for Appellant in District Court

4. Balogh, Gabor, Deceased from Underlying Capital Proceeding

5. Boulee, Jean-Paul, District Court Judge

6. Burton, Beth Attaway, Counsel for Appellee

7. Clark, Michael C., Trial Judge from Underlying Capital Proceeding

8. Carr, Christopher, Counsel for Appellee

9. Carroll, Vanessa, Previous Counsel for Appellant

10. Caudill, Lauren, Federal Habeas Counsel

11. Clark, Michael C., Trial Judge from Underlying Capital Proceeding

12. Christian, Ryan M., Counsel for Appellant in the District Court

13. Daniel, Laurie Webb, Previous Eleventh Circuit Counsel for Appellant in this Court

14.  Davis, Alixandria Lynn, Previous Counsel for Appellant in the District Court

15.  Dunn, Thomas, State Habeas Counsel

16.  Emmons, Shawn, Appellee

17.  Friedlander, Matthew David, Counsel for Appellant

18.  Georgia Resource Center, Counsel for Appellant

19.  Graham, Sabrina, Counsel for Appellees

20.  Harbin, Ryan Elizabeth, Previous Counsel for Appellant in the District Court

21.  Hopkins, Sharon, Counsel for Appellant in resentencing trial proceedings

22.  Hunt, Willis B., Federal Habeas Judge

23.  Hutchins, John P., Counsel for Appellant in the District Court

24.  Isaacson, Cory, Counsel for Appellant

25.  Jordan, Frank, State Habeas Judge

26.  Kammer, Brian, State and Federal Habeas Counsel

27.  López-Delgado, Andrés, Counsel for Appellant

28.  Martin, De'Kelvin Rafael, Intervenor in District Court

29.  Malcolm, Clint, Counsel for Appellees

30.  Menk, Jacqueline, Counsel for Appellant in the District Court

31. Moore, Johnny, Trial Counsel from Underlying Capital Proceeding

32. Nance, Michael Wade, Appellant

33. O'Kelley, Elijah J., Counsel for Appellees

34. Olender Hellstrom, Victoria, Counsel for Appellant

35. Oliver, Tyrone, Appellee

36. Pearson, Lynn (Damiano), State and Federal Habeas Counsel

37. Petrany, Stephen John, Counsel for Appellees

38. Porter, Danny, District Attorney from Underlying Capital Proceeding

39. Rasmussen, Kristen, Counsel for Mr. Nance in the District Court

40. Salchow, Kirsten, State Habeas Counsel

41. Schiefer, Theresa, Assistant Attorney General from State Habeas

42. Sharkey, Kimmy, State Habeas Counsel

43. Watkins, Mitchell, Assistant Attorney General from Underlying Capital Proceeding

44. Webb Daniel Friedlander, LLP, Counsel for Appellant

45. Wylie, Phil, Assistant District Attorney from Underlying Capital Proceeding

46. Wilson, Edwin, Trial Counsel from Underlying Capital Proceeding

No publicly traded company or corporation has an interest in the outcome of this appeal.

*/s/ Andrés López-Delgado*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Michael Nance brought an as-applied challenge to his execution by lethal injection. In a bench trial, the district court committed foundational errors in its application of the relevant Federal Rules of Civil Procedure, resulting in significant prejudice to Mr. Nance. The district court also applied the incorrect legal standard in adjudicating his Eighth Amendment claim, and erroneously found no constitutional violation. Due to the importance of these issues and the gravity of the harm Mr. Nance will suffer, Mr. Nance requests that the Court hold oral argument in this matter.

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................ 1

STATEMENT OF THE ISSUES .................................................................. 2

STATEMENT OF THE CASE ...................................................................... 3

I.    Nature of the Case ......................................................................... 3

II.   Standard of Review ........................................................................ 7

SUMMARY OF THE ARGUMENT ............................................................ 8

ARGUMENT AND CITATION OF AUTHORITIES ...................................... 11

I.    The Court Abused Its Discretion by Permitting Defendants' Expert to
      Examine Mr. Nance for the First Time on the Morning of Trial, and
      Then Allowing Defendants' Expert to Testify as to Those
      Contemporaneously Formed Opinions. .................................................... 11

      A.    The district court clearly erred when it improperly granted
            Defendants' untimely request for their expert to examine Mr.
            Nance ..................................................................................... 13

      B.    The district court improperly admitted expert testimony arising
            from Dr. Antognini's last-minute visual and physical examination
            of Mr. Nance ........................................................................... 18

      C.    The last-minute disclosure of new expert testimony on a key fact
            issue in the case severely prejudiced Mr. Nance ........................... 24

      D.    The court's disregard of the Federal Rules of Civil Procedure to
            permit a trial by ambush requires reversal. ................................. 26

II.   The District Court Misapplied Well-Settled Supreme Court
      Precedent Governing Eighth Amendment Method-of-Execution
      Challenges ...................................................................................... 28

III.  Mr. Nance Should Prevail Under the Correct Legal Standard. ............ 31

IV.   The District Court Erred in Concluding That the State's Lethal
      Injection Protocol Does Not Entail a Substantial Risk of Severe
      Pain. ................................................................................................ 36

      A.    The evidence conclusively shows that Mr. Nance's
            compromised veins place him at substantial risk of severe
            pain. .................................................................................... 36

B.    The court erred by relying on mischaracterized testimony. ......... 39

C.    The court erred when it relied on facially deficient last-minute testimony from Dr. Antognini to counterbalance Dr. Waisel's testimony. ........................................................................... 41

D.    The court erred when it found that the absence of information in largely immaterial medical records outweighed Dr. Waisel's testimony. ........................................................................... 43

E.    The court erred when it relied on incomplete evidence regarding the execution team's ability to respond quickly to complications. 46

F.    The court erred by concluding that there is no significant risk of pain should a central line be needed. ........................................... 48

V.    The District Court Reversibly Erred in Allowing Critical Execution Team Witnesses to Testify Anonymously, Remotely, Without Cameras On, and Under the Supervision of Another Defense Witness. ............... 50

A.    Defendants failed to establish "good cause." ................................. 54

B.    The district court failed to ensure "appropriate safeguards" were in place. ...........................................................................
........................................................................... 59

C.    Despite the limitations in assessing their credibility, the court relied heavily on the anonymous witnesses' testimony in ruling against Mr. Nance. ........................................................................... 63

CONCLUSION ................................................................. 65

# TABLE OF CITATIONS

## Cases

*A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997 (11th Cir. 2003) ........................................................................ 7

*Affiliati Network, Inc. v. Common Sense Beauty, LLC*, 799 Fed.Appx 773 (11th Cir. 2020) ................................................................................. 51

*Arthur v. Dunn*, 137 S. Ct. 725 (2017) ............................................. 32, 33

*Ballesteros v. Wal-Mart Stores E., LP*, No. 2:19-CV-881-SPC-NPM, 2021 WL 2917553 (M.D. Fla. July 12, 2021) ............................................... 56

*Baze v. Rees*, 553 U.S. 35 (2008) ...................................................... 28

*Beck v. Prupis*, 162 F.3d 1090 (11th Cir. 1998) ............................. 8, 27

*Bowman v. Hawkins*, No. 04-370, 2005 WL 1527677 (S.D. Ala. June 28, 2005) ........................................................................................................ 20

*Bucklew v. Precythe*, 587 U.S. 119 (2019) ..................................28, 29, 30, 32

*Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635 (7th Cir. 2008) ............... 20

*Cochran v. Brinkmann Corp.*, No.1:08-cv-1790, 2009 WL 4823858 (N.D. Ga. Dec. 9, 2009) ........................................................................... 21

*Cooper v. S. Co.*, 390 F.3d 695 (11th Cir. 2004) ............................. 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ............. 25

*Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335 (N.D. Ga. 2012) ........................................................................................ 22

*Eli Rsch., LLC v. Must Have Info Inc.*, No. 2:13-cv-695, 2015 WL 13734988 (M.D. Fla. Sept. 9, 2015) .......................................................... 21

*Fears v. Morgan (In re Ohio Execution Protocol)*, 860 F.3d 881 (6th Cir. 2016) ........................................................................................................ 62

*Glossip v. Gross*, 576 U.S. 863 (2015)............................................................ 28

*Goldberg v. Kelly*, 397 U.S. 254 (1970)........................................................... 51

*Hamlett v. Carroll Fulmer Logistics Corp.*, 176 F. Supp. 3d 1360 (S.D. Ga. 2016)............................................................................................................ 21

*Harbison v. Little*, 511 F. Supp. 2d 872 (M.D. Tenn. 2007) ........................... 62

*Haygood v. Auto–Owners Ins. Co.*, 995 F.2d 1512 (11th Cir. 1993)................. 8

*Helling v. McKinney*, 509 U.S. 25 (1993) ....................................................... 31

*HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867 (11th Cir. 2005) ...... 7

*Hickman v. Taylor*, 329 U.S. 495 (1947) ........................................................ 11

*Jackson v. Johnson & Johnson*, No. 1:11-CV-3903-TWT, 2022 WL 110422 (N.D. Ga. Jan. 12, 2022).............................................................................. 20

*Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322 (11th Cir. 2020) ....... 58

*K&H Dev. Group., Inc. v. Howard*, 255 F.R.D. 562 (N.D. Fla. 2009) ............ 21

*Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299 (11th Cir. 2013) ... 8

*Leathers v. Pfizer, Inc.*, 233 F.R.D. 687 (N.D. Ga. 2006) ................................ 22

*Long v. E. Coast Waffles, Inc.*, 762 Fed.Appx 869 (11th Cir. 2019) ............... 19

*Martin v. Oliver, et al.,* No. 1:18-CV-4617, D.120-4, H'ing Transcript at 54 (July 20, 2022) .............................................................................................. 57

*Michael Anthony Taylor*, No. 05-cv-4173 (W.D. Mo. May 30, 2006).............. 63

*Mitchell v. Ford Motor Co.*, 318 Fed.Appx 821 (11th Cir. 2009).................... 22

*Nance v. Ward*, 597 U.S. 159, 164 (2022).................................................. 28, 29

*Ohio Execution Protocol Litig.*, 845 F.3d 231 (6th Cir. 2016) ........................ 58

*Parkhurst v. Belt*, 567 F.3d 995 (8th Cir. 2009)............................................. 55

*Silverstein v. Proctor & Gamble Mfg. Co.*, 700 F. Supp. 2d 1312 (S.D. Ga.

2009)..................................................................................................... 19

*Silvious v. Pharaon*, 54 F.3d 697 (11th Cir.1995) ............................................ 8

*United States v. Brown*, 415 F.3d 1257 (11th Cir.2005)................................... 8

*United States v. Estelan*, 156 Fed.Appx 185 (11th Cir.2005)..................... 8, 18

*United States v. Henderson*, 409 F.3d 1293 (11th Cir. 2005)......................... 27

*United States v. Lebowitz*, 676 F.3d 1000 (11th Cir. 2012) .............................. 8

*Waite v. AII Acquisition Corp.*, No. 15-cv-62359, 2016 WL 4433713 (S.D. Fla. Apr. 27, 2016) .................................................................................. 11

*Warner v. Cate*, No. 1:12-CV-1146-LJO-MJS, 2015 WL 4645019 (E.D. Cal. Aug. 4, 2015) .................................................................................... 56

## Statutes

O.C.G.A. § 42-5-36........................................................................... 6, 52

O.C.G.A. § 42-5-36(d) ...................................................................... 58

## Rules

Fed. R. Civ. 37(c)(1) ........................................................................... 22

# JURISDICTIONAL STATEMENT

Plaintiff appeals from the final judgment of the United States District Court for the Northern District of Georgia entered on February 14, 2025. D.158. The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff sued Defendants pursuant to 42 U.S.C. § 1983. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. On March 14, 2025, Plaintiff timely filed a motion to alter or amend the judgment, D.159, which the court denied on April 28, 2025. D.163. Plaintiff filed a timely notice of appeal on May 27, 2025. D.164.

## STATEMENT OF THE ISSUES

1. Whether the district court erred by suspending the Rules of Civil Procedure to permit Defendants' expert to conduct, for the first time, a medical examination of Mr. Nance on the first day of trial, and then to testify on the results of his examination at trial.

2. Whether the district court reversibly erred by undertaking the incorrect legal analysis to determine whether Georgia's execution protocol as applied to Mr. Nance does not violate the Eighth Amendment.

3. Whether the district court clearly erred in fact-findings regarding the risk of unconstitutional pain if Mr. Nance is subjected to Georgia's lethal injection protocol.

4. Whether the district court erred by permitting witnesses who are members of the execution team to testify anonymously, remotely, without cameras on, and under the supervision of another witness for the defense.

## STATEMENT OF THE CASE

### I.    Nature of the Case

In this case, Plaintiff Michael Nance challenges the constitutionality of his execution by lethal injection as applied to him under 28 U.S.C. § 1983 due to his severely compromised veins and his long-term use of gabapentin. The district court initially dismissed Mr. Nance's lawsuit under Federal Rule of Civil Procedure ("Rule") 12(b)(6) as untimely and for failing to state a claim. On appeal, this Court reconstrued the challenge as a "second or successive" habeas petition and affirmed the dismissal on those alternate grounds. The Supreme Court granted certiorari and reversed. On remand, this Court reversed the district court's initial dismissal order. The case returned to the district court, which held a trial in May 2024.

The district court conducted the trial with disregard for the Federal Rules of Civil Procedure, the Federal Rules of Evidence, and notions of fundamental fairness. Over Mr. Nance's repeat objections, the court allowed Defendants' expert, Dr. Joseph Antognini, to conduct an examination of what the court itself considered "one of the key issues in this case," D.147:7—the condition of Mr. Nance's veins—the very morning that trial began. This was

the first and only time that Dr. Antognini examined Mr. Nance. He was then allowed to testify based on the examination later that same day, using it as the foundation for his opinion that the condition of Mr. Nance's veins would not impact an attempted lethal injection.

No new developments in the case justified this out-of-time, late-breaking examination. Instead, Defendants had purposefully waited until trial for Dr. Antognini to examine Mr. Nance, claiming they did so because it saved money, which the district court credited as "mak[ing] sense." D.147:6-7. At the same time, the court acknowledged repeatedly that allowing this day-of examination "put the plaintiff at some disadvantage under Rule 26 because you won't in advance of trial hear Dr. Antognini's opinion regarding the veins." D.147:7; *see also id.* at 81 ("I understand that there's some prejudice to that last-minute exam[.]"); 82 ("I think that there is some prejudice here given that you didn't get more notice about this than you did."). But the court allowed the examination and testimony to go forward nonetheless, reasoning that "plaintiff's expert will listen to Dr. Antognini's testimony and respond to it to the extent that there's disagreement," D.147:8, and that "I think the prejudice is probably the type that can be cured," *id.* at 82.

4

In allowing this examination and Dr. Antognini's subsequent testimony, the court disregarded Rule 26(a)(2), which requires expert reports to set forth "a complete statement of all opinions the witness will express" at trial, as well as the facts or data underlying those opinions—during the *discovery process*, not on the morning of trial. Ignoring Rule 26 resulted in a trial by ambush. Mr. Nance did not have the opportunity to depose Dr. Antognini on his findings during the discovery process, utilize effectively his own expert in rebuttal, or meaningfully cross Dr. Antognini at trial.

Mr. Nance had no advance notice of Dr. Antognini's day-of examination opinions. They were disclosed for the first time on the stand—more than nine months after his report was submitted, and more than seven months after his deposition took place—leaving Mr. Nance unable to meaningfully cross-examine him or rebut his testimony. These brand-new, critical opinions during trial ambushed Mr. Nance and infected the trial with fundamental unfairness—and the court credited those opinions in ruling against Mr. Nance.

The court continued to skirt the rules when it disregarded Rule 43 and allowed Defendants' witnesses to testify anonymously, remotely, without

5

video, and with another defense witness attesting to their identity and environment. These accommodations, permitted without good cause or appropriate safeguards, surpassed those given to execution participant witnesses in any other method-of-execution case that undersigned counsel have found addressing the issue.

In facilitating these unorthodox procedures, the court acknowledged the prejudice to Mr. Nance—"Plaintiff notes that evaluating the credibility of anonymous witnesses is more difficult. I agree that there is some issue there and there's a cost," D.147:10. The court justified its subversion of Rule 43 by citing Georgia's Lethal Injection Secrecy Act, O.C.G.A. § 42-5-36(d) ("Secrecy Act"). But there is no Secrecy Act exception to Rule 43. There were many options available for protecting the witnesses' identifying information short of allowing out-of-the-courthouse, fully anonymous testimony—for example, closing the courtroom from the public during their testimony; prohibiting questions that might elicit identifying information; or allowing the witness to be seen only by the examining counsel and the court. Mr. Nance suggested, but the court rejected, all these options. Instead, the court allowed these key

witnesses to testify far outside of the protections and the procedures that the Rules consider paramount.

Then, in its post-trial order denying relief, the court applied the incorrect legal standard by expressly declining to compare Defendants' preferred method of execution to Mr. Nance's proposed alternative, D.163:23, despite Supreme Court precedent requiring it to do so. And, even in its application of the incorrect standard, the district court relied on evidence of limited probative value and mischaracterized testimony to dismiss the substantial record evidence supporting Mr. Nance's claims that his compromised veins put him at unconstitutional risk of severe pain under the State's preferred method.

## II.    Standard of Review

On appeal of a district court order following a bench trial, this Court reviews "the [district] court's conclusions of law *de novo* and its findings of fact for clear error." *HGI Assocs., Inc. v. Wetmore Printing Co.*, 427 F.3d 867, 873 (11th Cir. 2005) (citing *A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1003 (11th Cir. 2003)). The district court's interpretation of the Federal Rules of Civil Procedure is subject to *de novo*

7

review. *Beck v. Prupis*, 162 F.3d 1090, 1100 (11th Cir. 1998) (citing *Silvious v. Pharaon*, 54 F.3d 697, 700 (11th Cir.1995)), *aff'd*, 529 U.S. 494 (2000).

This Court reviews evidentiary rulings made by the trial court for abuse of discretion. *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1317 (11th Cir. 2013). "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Estelan*, 156 Fed.Appx 185, 196 (11th Cir.2005) (citing *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir.2005)). "[F]actual findings underlying [evidentiary] rulings are reviewed for clear error," *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012), and questions of law underlying evidentiary rulings are reviewed *de novo*, *see Lamonica*, 711 F.3d at 1317. Erroneous evidentiary rulings warrant reversal when they "affect the substantial rights of the parties." *Haygood v. Auto–Owners Ins. Co.*, 995 F.2d 1512, 1515 (11th Cir. 1993) (cleaned up).

## SUMMARY OF THE ARGUMENT

The district court committed several foundational, prejudicial errors during Mr. Nance's bench trial. The court abused its discretion by suspending

the Rules of Civil Procedure to allow the Defendants' last-minute expert examination and subsequent testimony on a key issue. The result was trial-by-ambush on the key factual inquiry presented to the court. The court again disregarded the Rules of Civil Procedure at Defendants' request, allowing four key defense witnesses to testify anonymously, remotely, at a private office, with video off to examining counsel (and, for two, also to the court), and under the supervision of another defense witness. Despite Mr. Nance's repeat objections and proffered alternatives, and while admitting that it would make assessing the witnesses' credibility more difficult, the court treated Georgia's Secrecy Act as a statutory exception to Rule 43, despite case law from this Court that the Act does not confer a federal privilege. In ruling against Mr. Nance, the court favorably cited the Defendants' expert's testimony regarding his last-minute examination and the testimony of the anonymous execution team witnesses.

Especially in a death penalty case—and one in which this Court has previously reversed the lower court for failing to properly follow the Federal Rules of Civil Procedure—caution was critical. Instead, the court conducted a trial that disregarded the Rules and deferred to Defendants' wishes at Mr.

Nance's expense. Mr. Nance was left scrambling to address a surprise expert examination and new expert opinions on a dispositive issue, and had to cross-examine witnesses who were permitted to testify out of court, in secret, and without even having to look counsel in the eye.

The district court also applied an incorrect legal standard to its analysis of Mr. Nance's as-applied method-of-execution claim. Supreme Court precedent—including from this very case, *see Nance v. Ward*, 597 U.S. 159 (2022)—makes clear that a trial court must compare the risk of unconstitutional pain and suffering resulting from the State's preferred execution method with the risk resulting from plaintiff's proposed alternative in order to determine whether the State's method violates the Eighth Amendment. The court here did not undertake the required comparative analysis. Instead, it wholly ignored unrebutted evidence about the efficacy and feasibility of Mr. Nance's proposed alternative, firing squad, and then made various errors in order to find no unconstitutional risk in the current method, lethal injection, and consequently deny Mr. Nance relief.  When applying the correct comparative standard, the record clearly shows that the

10

State's proposed method cruelly superadds pain when compared to the firing squad.

## ARGUMENT AND CITATION OF AUTHORITIES

**I.  The Court Abused Its Discretion by Permitting Defendants' Expert to Examine Mr. Nance for the First Time on the Morning of Trial, and Then Allowing Defendants' Expert to Testify as to Those Contemporaneously Formed Opinions.**

The district court abused its discretion when, over Mr. Nance's strong objection and to save the State the cost of a plane ticket, it suspended the Federal Rules of Civil Procedure to permit Defendants-Appellees' expert Dr. Antognini to examine Mr. Nance at the courthouse on the morning of the first day of trial. D.136-1. This was the first and only time Dr. Antognini examined Mr. Nance. The Court then compounded its error by allowing Dr. Antognini to testify regarding his opinions formed from his last-minute examination, again over Mr. Nance's objection and in contravention of the Rules. D.147:7.

The court's abuse of discretion affected Mr. Nance's substantial rights. The court countenanced "trial by ambush"—exactly the harm that the rules are designed to prevent. *See Waite v. AII Acquisition Corp.*, No. 15-cv-62359, 2016 WL 4433713, at *3 (S.D. Fla. Apr. 27, 2016); *see also Hickman v. Taylor*, 329 U.S. 495, 501 (1947) ("[C]ivil trials in the federal courts no longer need be

11

carried on in the dark. The way is now clear . . . for the parties to obtain the fullest possible knowledge of the issues and facts *before trial*.") (emphasis added). Mr. Nance was functionally precluded from mounting a methodology-based challenge, or indeed any other challenge under Federal Rule of Evidence 702 or otherwise, to this new and last-minute opinion. Mr. Nance and his expert also had no opportunity to meaningfully rebut Dr. Antognini's opinions. In addition, Mr. Nance's counsel had to, on the fly, re-plan their cross-examination of Defendants' expert and to re-tool the rebuttal testimony of Mr. Nance's expert, all to attempt to respond to testimony disclosed for the first time on the stand.

The district court's Findings of Fact favorably cite and quote directly from Defendants' expert's testimony regarding his visual and physical examination of Mr. Nance. D.163:11 & n.6. And because Defendants proffered this new testimony to bolster their expert's conclusion that Mr. Nance is not at substantial risk of severe pain under Defendants' execution protocols, it is impossible to disentangle the improperly introduced testimony from the rest of the court's findings.

12

Because the court clearly erred in permitting the last-minute examination and subsequent testimony, and because its error affected Mr. Nance's substantial rights, this Court should reverse.

### A. The district court clearly erred when it improperly granted Defendants' untimely request for their expert to examine Mr. Nance.

The district court committed the first of several errors when, via email on May 15, 2024, D.136, it granted Defendants' last-minute request to have Dr. Antognini visually and physically examine Mr. Nance on the morning of trial, May 20, 2024.

Dr. Antognini submitted his initial report on August 9, 2023, and his supplemental report on August 25, 2023. He was deposed on September 14, 2023, and testified that he (unlike Mr. Nance's expert) "had not directly examined [Mr. Nance] and [didn't] have an opinion based on a direct examination" about Mr. Nance's veins and the risk of pain that Defendants' execution protocols posed. D.132-22:33. Dr. Antognini's stunning admission that he planned to testify regarding Mr. Nance's venous conditions without medically examining Mr. Nance would ultimately have served as an important line of attack at trial.

13

The expert discovery period closed on September 15, 2023. D.69. Defendants did not lodge any requests for an extension so that Dr. Antognini could have the opportunity to examine Mr. Nance, nor did they otherwise indicate that they believed expert discovery to be incomplete. Subsequently, at a hearing on December 5, 2023, the court set the trial for May 20, 2024. D.112. The same day, the Court entered the parties' Joint Consolidated Pretrial Order, in which Defendants represented they had no pending issues. D.111:2. At no point during the expert discovery period, or indeed at any time prior to May of 2024, did Defendants request that their expert be permitted to examine Mr. Nance or to proffer new testimony based on the results of that examination.

Instead, late on May 9, 2024, and following a series of calls and emails finalizing logistics for the May 20 trial date, counsel for Defendants asked *for the first time* whether Plaintiff's counsel would agree to Dr. Antognini visually and physically examining Mr. Nance the day before or the day of trial. After Plaintiff's counsel responded that they objected to Defendants' untimely and improper request, Defendants sent the below email to the court's deputy clerk:

14

Mr. Nance has alleged that his veins are too compromised to either obtain IV access and/or sustain intravenous flow without extravasation. Mr. Nance's expert Dr. David Waisel has opined that Mr. Nance's veins appear "torturous" in support of this allegation. It had been Defendants' intention to have their expert Dr. Joseph Antognini examine the veins in Mr. Nance's veins arms [sic] on the first day of the trial as this was a question propounded to him in his deposition taken by counsel for Mr. Nance. This was not done previously because Dr. Antognini lives in California and it would have cost thousands of taxpayer dollars for him to travel to Georgia for a short examination.

*See* D.136.

As relevant here, Defendants' last-minute request demonstrates that:

- they understood from the outset of this litigation that the condition of Mr. Nance's veins was a key fact question—indeed, arguably *the* key fact question—in this case;

- they understood, from the time of the expert discovery period, that Mr. Nance's expert had examined Mr. Nance and would be opining on the results of his examination at trial;

- they had decided *not* to have Dr. Antognini examine Mr. Nance prior to rendering his opinions during the expert discovery period;

- they long planned to circumvent the discovery process and try to gain a critical strategic advantage over Mr. Nance by having their expert examine Mr. Nance on the eve of trial; and

- they intentionally declined to inform Plaintiff's counsel or the court of this plan until mere days before trial was set to begin.

In other words, Defendants knowingly and willfully sought to make an end-run around the Federal Rules of Civil Procedure and the court's scheduling and pre-trial orders.[1]

Plaintiff's counsel responded to Defendants' email making clear the prejudice to Mr. Nance that would result from a last-minute examination and untimely disclosure of any new expert testimony. As counsel explained:

> Whether Dr. Antognini uses the information gained from the examination to form new opinions, or to supplement his existing opinions with new facts or data, Plaintiff will be hearing what he has to say for the first time in open court, suborning the fundamental purpose of the Rules' expert disclosure requirements to provide notice to opposing counsel of the opinions that the expert will express at trial.

D.136. On May 15, the court's deputy clerk emailed the parties with the court's decision:

> [T]he Court believes that the State's expert should be permitted to perform a brief diagnostic inspection of Mr. Nance's veins prior to the start of the trial. If counsel for Mr. Nance believes that, under Fed. R. Civ. P. 26, the expert should not be permitted to testify about his opinion of the state of Mr. Nance's veins, that is an issue that can be resolved during the trial or after briefing by the parties.

---

[1] Dr. Antognini himself confirmed that Defendants intentionally delayed the timing of his examination until the eve of trial. As he explained on the stand: "I think very early on we discussed whether I should examine [Mr. Nance] or not. And the suggestion was made that I could do that basically the day of the trial." D.148:8.

D.136-1. The court did not explain its reasoning, nor did it identify the legal authority under which it was permitting the last-minute examination. In sanctioning the examination, the court excused Defendants from compliance with:

- the court's own scheduling order, D.69, which set the close of expert discovery on September 15, 2023—nearly eight months before Defendants' request;

- the court's own pre-trial order, D.111, dated December 5, 2023, in which Defendants certified that they had no pending matters;

- Rule 26, governing the disclosure of expert testimony during the discovery period and pretrial disclosures; and

- Rule 35, governing motions for physical and mental examinations during discovery.

Neither the district court nor Defendants identify any Rule or other authority requiring a party to submit to a medical examination by the opposing party's expert months after the end of discovery and after the opposing party repeatedly certified that they had no pending discovery-related matters requiring attention. Defendants willfully failed to comply with the scheduling and pretrial orders, which is sanctionable conduct under Rule 16(f)(1)(C). And they failed to timely disclose or supplement pursuant to Rule 26, which is sanctionable under Rule 37(c)(1). But instead of sanctioning

17

their noncompliance, the trial court rewarded it. By allowing the *ultra vires* examination of Mr. Nance to proceed, the court rewarded Defendants' brazen skirting of the Rules, giving them a critical advantage during trial. The district court made a clear error in judgment that warrants reversal. *See Estelan*, 156 Fed.Appx at 196.

### B. The district court improperly admitted expert testimony arising from Dr. Antognini's last-minute visual and physical examination of Mr. Nance.

Having learned that the court would allow Defendants' expert to proceed with the examination, Plaintiff's counsel submitted a motion requesting that the district court exclude any testimony "concerning [Defendants' expert's] last-minute medical examination of Plaintiff and any related supplemental and/or revised opinions." D.135:9. Counsel explained that disclosure of any such testimony at trial would plainly violate the expert disclosure requirements under Rule 26, and that Defendants had no basis for claiming that failure to timely disclose that testimony was "substantially justified or harmless" pursuant to Rule 37(c)(1). *Id.* at 7-9.

Indeed, Rule 26(a)(2) requires expert reports to set forth "a complete statement of all opinions the witness will express" at trial, as well as the facts

or data underlying those opinions. Rule 26(a)(2)(B)(i). Rule 26's notice requirement provides the parties with "the opportunity to prepare adequate and effective cross-examination, and ensures that there will be no unfair surprise." *Silverstein v. Proctor & Gamble Mfg. Co.*, 700 F. Supp. 2d 1312, 1320 (S.D. Ga. 2009).[2]

"Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, compliance with the requirements of Rule 26 is *not merely aspirational*." *Long v. E. Coast Waffles, Inc.*, 762 Fed.Appx 869, 870 (11th Cir. 2019) (emphasis added) (quoting *Cooper v. S. Co.*, 390 F.3d 695, 728 (11th Cir. 2004)). So important is it that the opposing party receive adequate advance notice of expert testimony that courts have expressed concern when experts disclose new opinions during a *deposition*, a scenario dramatically less

---

[2] Rule 26 provides that "[a] party must make these disclosures at the times and in the sequence that the court orders." If there is no such order, "the disclosures must be made: (i) at least 90 days before the date set for trial or for the case to be ready for trial" or within 30 days of the other party's disclosure "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party[.]" Rule 26(a)(2)(D) (emphasis added). Here, the parties exchanged disclosures pursuant to the court's pre-trial order entered on December 5, 2023, in which Defendants made no mention of their intent to have their expert examine Mr. Nance before trial.

concerning than new opinions disclosed for the first time at *trial*. In *Ciomber v. Coop. Plus, Inc.*, for instance, the Seventh Circuit emphasized:

> Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony. The purpose of Rule 26(a)(2) is to provide notice to opposing counsel— before the deposition—as to what the expert witness will testify, and this purpose would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony.

527 F.3d 635, 642 (7th Cir. 2008) (affirming district court's refusal to permit supplementation of an expert report with deposition testimony); *see also Jackson v. Johnson & Johnson*, No. 1:11-CV-3903-TWT, 2022 WL 110422, at *3 (N.D. Ga. Jan. 12, 2022) (disallowing supplementation of deficient expert report with later deposition testimony) (quoting *Ciomber*).

Furthermore, trial courts in this Circuit have consistently excluded late-disclosed expert testimony on the grounds that new expert opinions cannot be injected into litigation after the close of expert discovery, precisely to prevent parties from engaging in trial by ambush. *See Bowman v. Hawkins*, No. 04-370, 2005 WL 1527677, at *2 (S.D. Ala. June 28, 2005) ("It is disingenuous to argue that the duty to supplement under Rule 26(e)(1) can be used as a vehicle to disclose entirely new expert opinions after the expert disclosure deadline established by the court[.]") (cleaned up); *Hamlett v.*

*Carroll Fulmer Logistics Corp.*, 176 F. Supp. 3d 1360, 1363 n.5 (S.D. Ga. 2016) ("[T]he rules and case law require timely disclosure and timely supplementation; trial by ambush is not permitted. Nor are reports that are blatantly untimely or rely on supplementation to dodge a deadline."); *Eli Rsch., LLC v. Must Have Info Inc.*, No. 2:13-cv-695, 2015 WL 13734988, at *3 (M.D. Fla. Sept. 9, 2015) (concluding that a plaintiff cannot use the duty of supplementation to add to an expert's opinions regarding matters outside the context of the previously submitted expert report); *K&H Dev. Group., Inc. v. Howard*, 255 F.R.D. 562, 567-68 (N.D. Fla. 2009) (striking an expert's "supplemental" report that included a new theory of damages based on information available when expert prepared the initial report); *Cochran v. Brinkmann Corp.*, No.1:08-cv-1790, 2009 WL 4823858 at * 5 (N.D. Ga. Dec. 9, 2009) (stating that the supplementation option under Rule 26(e) "is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect a litigating strategy"), *aff'd*, 381 F. App'x 968 (11th Cir. 2010).

The Rules are clear on what should happen when a party fails to timely disclose expert testimony. Under Rule 37, the party is "not allowed to use

that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. 37(c)(1). "A discovery mistake is harmless if it is honest, and is coupled with the other party having sufficient knowledge that the material has not been produced." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 846 F. Supp. 2d 1335, 1358 (N.D. Ga. 2012) (cleaned up). Notably, "[t]he burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (quoting *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 697 (N.D. Ga. 2006)).

Here, Defendants did not even attempt to make a showing that their out-of-time disclosure was substantially justified or harmless. Their "mistake" was not "honest." By their own admission, they planned for months after the close of discovery to have their expert examine Mr. Nance on the eve of trial, and waited until mere days before trial to inform Plaintiff's counsel and the district court of that plan. D.136:4. And their supplementation was not based on any new information received about Mr. Nance's claims. Defendants knew for years that the tortuous condition of Plaintiff's veins was

22

a key fact that Mr. Nance intended to establish at trial. Furthermore, and in addition to Defendants' noncompliance with Rule 26, Defendants intentionally circumvented the district court's scheduling order and pretrial order.

Despite Defendants' willful noncompliance, the court allowed Defendants' expert to opine on the results of his last-minute, in-court visual and physical examination. D.147:7-8. In allowing that examination and the subsequent new testimony, the court endorsed Defendants' only proffered reason for the delay: a desire to save costs by not having their California-based expert make two trips to Georgia. The court did not identify, nor is undersigned counsel aware of, any cost-based exceptions to parties' obligations to comply with the Rules and with applicable court orders. And, if cost were a genuine concern, Defendants had full and fair opportunity to retain an expert who lived closer to Georgia or raise that concern at the appropriate time—during the discovery period.

The district court acknowledged that his decision "put the plaintiff at some disadvantage under Rule 26 because [plaintiff] won't in advance of trial hear Dr. Antognini's opinion regarding the veins," *id.*, but opined that the

23

prejudice was insubstantial because Mr. Nance had "a week or two" advance notice of the examination—though not its results—and because Plaintiff's expert could "listen to Dr. Antognini's testimony and respond to the extent that there's disagreement," D.147:8. In other words, the court endorsed precisely the kind of trial by ambush that the Rules of Civil Procedure were designed to prevent.

### C.  The last-minute disclosure of new expert testimony on a key fact issue in the case severely prejudiced Mr. Nance.

On the stand later the same day, Defendants' expert opined at length regarding his courthouse examination of Plaintiff. D.147:185-87. After testifying as to his specious and superficial methodology and findings—all of which Plaintiff's counsel and Plaintiff's expert heard him describe for the first time on the stand—he testified that his examination led him to conclude that "venous access should not be an issue." *Id.* at 187. While this opinion was consistent with the opinions in his initial report, it rested on a new and fundamentally different foundation, one that Plaintiff's counsel and expert were forced to attempt to address mid-trial. The court's decision to admit this testimony over Plaintiff's objections fundamentally altered the course of the trial and the parties' respective positions.

24

Plaintiff's counsel had prepared for testimony from an expert who had formed his opinions about the efficacy of venous access without ever bothering to examine Mr. Nance's veins—a fact that would have severely damaged his credibility at trial. Instead, benefitting from their willful noncompliance with the Rules, Defendants' expert was permitted to last-minute examine Mr. Nance and keep his methods and conclusions drawn therefrom unknown to Mr. Nance, his counsel, or his expert until the testimony was delivered in open court. Plaintiff was prejudiced in ways that could not be cured. Among other harms, the court precluded Mr. Nance from challenging the admissibility of Dr. Antognini's new testimony pursuant to Federal Rule of Evidence 702, because Mr. Nance had no advance notice of Dr. Antognini's methodology or opinion.

And Mr. Nance could have mounted a successful challenge under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). As explained in greater detail in Section IV.C., *infra*, Dr. Antognini's methodology was plainly deficient. While Plaintiff's expert Dr. Waisel did his best to point out the deficiencies in Dr. Antognini's methodology after hearing Dr. Antognini's testimony for the first time in court, Mr. Nance should have

had the opportunity to meaningfully test Dr. Antognini's methodology during discovery and to seek, during motion practice, exclusion of Dr. Antognini's opinions arising from his plainly deficient physical examination. The court deprived Mr. Nance of this critical evidentiary safeguard.

The district court's opinion (1) partially bases its conclusion that Mr. Nance is not at substantial risk of severe harm under existing protocols on Dr. Antognini's testimony, and (2) Dr. Antognini's last-minute physical examination was a key component of the testimony. The court describes Dr. Antognini's medical examination and his conclusions therefrom in its Findings of Fact section, including a block quote from the expert describing his findings. *See* D.163:11 & 11 n.6.

### D. The court's disregard of the Federal Rules of Civil Procedure to permit a trial by ambush requires reversal.

The court disregarded the Rules in permitting Defendants' expert to medically examine Mr. Nance the morning of trial and then to opine on the results of that examination for the first time on the stand. The court did so despite knowing, by Defendants' own admission, that Defendants' failure to disclose until the eve of trial was an intentional litigation strategy. And it did so despite knowing that the result would necessarily be trial by ambush on

26

the key factual issue in dispute at trial, the exact harm that the Rules are designed to prevent. There is no question that the court fundamentally erred in its application of the Rules in allowing Dr. Antognini's last-minute examination, and there is no question that Mr. Nance's substantial rights were affected. Accordingly, this Court should reverse.

The court is owed little, if any, deference here. The court did not perform its Rule 702 gatekeeping function in any meaningful sense in choosing to admit the testimony. Instead, the district court admitted the testimony based on an erroneous view of what Rule 26 and Rule 37 require, and this Court can and should review the district court's erroneous interpretation of the Rules *de novo. See Beck*, 162 F.3d at 1100. Furthermore, "basing an evidentiary ruling on an erroneous view of the law constitutes an abuse of discretion per se." *United States v. Henderson*, 409 F.3d 1293, 1297 (11th Cir. 2005). Accordingly, this Court should reverse the district court's post-trial order denying relief and remand for a new trial untainted by surprise expert testimony.

27

## II. The District Court Misapplied Well-Settled Supreme Court Precedent Governing Eighth Amendment Method-of-Execution Challenges.

The district court misapplied the foundational law governing Eighth Amendment method-of-execution claims[3]—a clear error of law that warrants reversal. To prevail in an as-applied method-of-execution claim, "a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 587 U.S. at 134.

Determining the constitutionality of an execution method requires the trial court to *compare* the State's proposed method with the condemned plaintiff's proposed alternative. *See id.* ("The Eighth Amendment does not come into play unless the risk of pain associated with the State's method is 'substantial *when compared to* a known and available alternative.'") (citing *Glossip*, 576 U.S. at 878, and *Baze*, 553 U.S. at 61) (emphasis added). The Supreme Court emphasized the inherently comparative nature of the test as

_____

[3] *Baze v. Rees*, 553 U.S. 35, 52 (2008) (plurality op. of Roberts, C.J.); *Glossip v. Gross*, 576 U.S. 863, 877-78 (2015); *Bucklew v. Precythe*, 587 U.S. 119, 139-40 (2019); *Nance v. Ward*, 597 U.S. 159 (2022).

recently as its 2022 decision in this very litigation, explaining that "only through a comparative exercise, we have explained, can a judge decide whether the State has cruelly superadded pain to the punishment of death."

*Nance*, 597 U.S. at 164. And in *Bucklew*, the Court explained:

> Distinguishing between constitutionally permissible and impermissible degrees of pain, *Baze* and *Glossip* explained, *is a necessarily comparative exercise*. To decide whether the State has cruelly "superadded" pain to the punishment of death isn't something that can be accomplished by examining the State's proposed method in a vacuum, but only by "comparing" that method with a viable alternative.

587 U.S. at 136 (emphasis added). The Court further explained that the comparative nature of the test is consistent with "the original and historical understanding of the Eighth Amendment on which *Baze* and *Glossip* rest," explaining that

> when it comes to determining whether a punishment is unconstitutionally cruel because of the pain involved, the law has *always* asked whether the punishment "superadds" pain well beyond what's needed to effectuate a death sentence. And *answering that question has always involved a comparison with available alternatives*, not some abstract exercise in "categorical" classification.

*Id.* at 136-37 (emphasis added).

Thus, the Supreme Court's precedent is clear that a trial court cannot "examin[e] the State's proposed method in a vacuum," *Bucklew*, 587 U.S. at 136, and must instead compare it to the plaintiff's proposed alternative.

Examining the State's proposed method in a vacuum—expressly prohibited by the Supreme Court—is exactly what the district court did here. The Court evaluated the State's lethal injection protocol without making any comparison whatsoever to the proposed alternative, firing squad. D.163:23. Indeed, the court expressly concluded that it had "no need to address the argument that the firing squad is a feasible and readily available alternative that could significantly reduce [Mr. Nance's] pain." *Id*. The isolated and incomplete inquiry in which the court engaged is clearly erroneous under governing law, requiring reversal by this Court.

When Mr. Nance sought to alter or amend the judgment on this basis, D.159, the court denied the motion and defended its decision-making. The court acknowledged that it "only analyzed the first prong of the *Baze-Glossip* test," D.162:4, but emphasized that the test is typically framed as a two-pronged conjunctive test, D.162:5, and that, "as a general rule, when weighing a conjunctive test," the court has the "usual authority to control the

30

order of proof[.]" *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). But the district court simply ignored the straightforward instructions in *Bucklew* and *Nance* on how to apply *this particular test*, instructions that necessarily supersede whatever "general rule" may govern conjunctive tests generally.

After it had affirmed its denial of relief, the court included a short coda "briefly address[ing]" firing squad. D.162:9-11. Even as it purportedly addressed it, the court simply reiterated its foundational misunderstanding of the operative test, analyzing the State's proposed method in a vacuum and concluding that no comparative exercise is necessary. D.162:10 (finding Mr. Nance did not "show that Georgia's lethal injection protocol would cause severe pain" and that it was therefore "*impossible* for him to show the existence of an alternative method of execution that would significantly reduce the risk of severe pain caused by the existing method").

## III.  Mr. Nance Should Prevail Under the Correct Legal Standard.

Application of the correct standard to the record evidence demonstrates that the State's method of lethal injection cruelly superadds pain when compared to Mr. Nance's proposed alternative, firing squad. Two sitting U.S. Supreme Court justices, including at least one justice in the *Bucklew*

majority, have opined that firing squad may be an immediate and "comparatively painless" method of execution. *See Arthur v. Dunn*, 137 S. Ct. 725, 728 (2017) (Sotomayor, J., dissenting from denial of certiorari) ("In addition to being near instant, death by shooting may also be comparatively painless."); *Bucklew*, 587 U.S. at 152-53 (Kavanaugh, J., concurring). Plaintiff's firing squad expert Dr. Williams presented unrebutted testimony that firing squad is feasibly and readily implemented in Georgia, D.147:61-62, 78-79, and Defendants conceded as much in their post-trial brief. D.152:51 n.17.

At trial, Dr. Williams explained that the firing squad fusillade produces unconsciousness "virtually instantaneously, at most within three to four seconds," and that the condemned "would be experiencing nothing that we would call pain instantaneously for physiological and ballistic reasons[.]" D.147:50-51. Dr. Williams explained that a 30-caliber bullet fired from a standard-issue service rifle produces both permanent cavitation—in essence, the hole that is drilled through the body—and temporary cavitation, in which soft tissue surrounding the permanent cavity expands rapidly before snapping back into place. D.147:52-54. Significantly, Dr. Williams explained

32

that nerves subjected to temporary cavitation become unable to function physiologically for hours after the trauma—and are, therefore, unable to transmit pain. *Id.* Dr. Williams testified that this phenomenon is well-documented and that he has observed it in his own patients, and experienced it himself when he was shot in the chest. *Id.* at 54. Dr. Williams further stated in his report that there have been no botched executions under modern protocols in Utah. P-04:10.[4] The error rate for lethal injection, by contrast, is roughly seven percent in the modern era. *Id.*; *see also Arthur v. Dunn*, 137 S. Ct. 725, 728 (2017) (Sotomayor, J., dissenting from denial of certiorari) (noting that none of the thirty-four executions by firing squad conducted in the United States since 1900 have been botched, whereas roughly 7.12 percent of the 1,054 executions by lethal injection have been botched over the same period). Defendants failed to meaningfully rebut Dr. Williams's testimony on the speed and efficacy of Mr. Nance's proposed alternative. Dr. Antognini asserted in his report that "not all firing squad executions go

---

[4] Citations to the trial exhibits will be as follows: "P-#" for Plaintiff's Exhibits, "D-#" for Defendants' Exhibits, and "J-#" for the parties' Joint Exhibits. The exhibits were submitted to the Clerk via a USB drive. *See* D.146. Mr. Nance will be filing a Motion to Supplement the Record with these exhibits in the district court simultaneous to the filing of this Brief.

'smoothly,'" D-01:13, but appears to have premised his opinion on a YouTube video of an execution conducted in Guatemala that, as Dr. Williams explained, was carried out under protocols that obviously and materially deviate from the proposed modern-day protocols, which Defendants do not dispute could be adopted in Georgia, D.147:73-74. At trial, Dr. Antognini testified that he has no opinion on: the likelihood of an equipment malfunction; how to properly restrain the condemned; the composition of the firing squad or its positioning with respect to the condemned; the trajectory that the bullets from the fusillade would take when passing through the condemned's body; or the likelihood of the cardiovascular bundle being destroyed immediately. D.148:38-42. In other words, Dr. Antognini offered no opinion on the parts of the process that determine whether a firing squad execution goes "smoothly."

Dr. Antognini also suggested that it may take closer to eight to ten seconds for a condemned person to be rendered unconscious during a firing squad execution. D.147:220. But Dr. Antognini based his opinion not on gunshot wounds to the chest, but instead on examples of football players and karate practitioners who are hit in the chest and continue to move normally

34

for several seconds before collapsing into unconsciousness. *Id.* at 221. As Dr. Williams explained in rebuttal, Dr. Antognini was describing commotio cordis, a phenomenon "noted primarily in sports medicine" in which the heart's rhythm is disrupted via a blow to the chest. D.148:64-65. A person experiencing commotio cordis could, consistent with the experiences of some athletes, move normally for several seconds before either recovering or collapsing into unconsciousness. *Id.* at 65. But a person whose cardiovascular bundle is destroyed will, by contrast, necessarily and immediately undergo ventricular fibrillation and lose consciousness. *Id.* at 67. Thus, Dr. Williams's three-to-four second timeline was based on his analysis of the wounds caused by a firing squad fusillade, whereas Dr. Antognini's competing timeline relied on anecdotal observations of a very different medical phenomenon in which the cardiovascular bundle remains intact. Dr. Antognini did not otherwise meaningfully rebut Dr. Williams's testimony on the speed, likelihood of pain, or error rate incident to firing squad executions.

The district court's findings of fact and conclusions of law wholly ignore Dr. Williams's testimony and downplay the ample evidence that Mr. Nance presented regarding the risks presented by execution by lethal injection. The

court heard—and rejected out of hand—testimony regarding an alternative

method with (1) a faster time to unconsciousness, (2) no possibility of venous

access issues and attendant complications, and (3) a lower error rate. Had the

court conducted the comparative analysis required by *Bucklew*, it would have

been compelled to conclude that Mr. Nance has shown that, in his case,

execution by lethal injection cruelly superadds pain over execution by firing

squad.

## IV. The District Court Erred in Concluding That the State's Lethal Injection Protocol Does Not Entail a Substantial Risk of Severe Pain.

Even if the legal standard permitted the district court to assess the

State's lethal injection protocol in a vacuum—which it does not, *see* Section

III, *supra*—the district court's finding that the State's lethal injection

protocol does not entail a substantial risk of severe pain to Mr. Nance is

clearly erroneous, and this Court should reverse.

### A. The evidence conclusively shows that Mr. Nance's compromised veins place him at substantial risk of severe pain.

The court clearly erred when it concluded that Mr. Nance's

compromised veins did not put him at substantial risk of severe pain. Mr.

36

Nance put on extensive expert evidence regarding the compromised state of his veins at trial. Mr. Nance's expert, Dr. Waisel—who, unlike Dr. Antognini, thoroughly examined Mr. Nance twice and submitted an expert report on the results of his examination—testified that he "followed every visible vein or palpable, feelable vein, from one end to the other to assess for signs of scarring. And [Mr. Nance] uniformly had scarring every vein that [he] was able to assess." D.148:72. Dr. Waisel explained that scarring can block the catheter from entering the vein at all, or it can force the catheter to become dislodged from the needle. D.147:96-97.

Dr. Waisel further explained that Mr. Nance's veins are "tortuous," meaning "they take twists and turns and angles . . . mak[ing] it more difficult to put the IV in and more difficult to advance the catheter." D.147:97. And Dr. Waisel testified that having tortuous veins "also makes the blood vessels much more likely to rupture, especially due to pressure." D.147:97-98. There was no dispute in the record that venous rupture (colloquially, "blowing a vein") can be incredibly painful, especially when it occurs during injection of intravenous fluids. P-01:4 (Waisel Expert Report).

There is also no dispute that venous rupture during administration of a

37

peripheral IV can result in extravasation. Extravasation—leakage of drugs into the soft tissue surrounding the ruptured vein—is painful, both because of the physical displacement of the skin and the burning in the affected tissue. D.147:99 (Waisel); *accord* D.150:82 ("The pain felt is the pressure on the tissue of that fluid being—you know, pushing the tissue out of the way or pushing the vein wall, that is a perceived painful feeling, or it can be.") (Anonymous Physician). Importantly, Dr. Waisel and Dr. Antognini agreed that extravasation could result in inadequate or inconsistent delivery of the State's execution drugs. D.147:128 (extravasation "likely to result in inadequate or inconsistent drug delivery") (Waisel); D.148:10 (Dr. Antognini agreeing that "extravasation can result in inadequate or inconsistent delivery" of the drugs). As Dr. Waisel explained and as Defendants failed to meaningfully rebut, inadequate or inconsistent drug delivery would result in "a prolonged execution that is likely to cause excruciating pain," D.147:128, and "could involve gasping and airway obstruction, and the excruciating feeling of suffocation," P-01:4. *See also* D.147:117 ("[I]nadequate delivery of the pentobarbital lead[s] to insufficient anesthesia. So the inmate would not be sufficiently anesthetized.") (Waisel).

38

In reaching its conclusion that, despite this testimony, Mr. Nance's compromised veins did not give rise to an unconstitutional risk of pain, the court erroneously relied on evidence with minimal probative value and mischaracterized testimony.

**B.    The court erred by relying on mischaracterized testimony.**

First, the court appears to have dismissed the weight of Dr. Waisel's testimony based on two statements that it grossly mischaracterized. The court cited Dr. Waisel's testimony that he had "no argument with the fact that a skilled clinician could insert a small IV in Mr. Nance." D.147:138. This out-of-context statement comes from Dr. Waisel's response to a question about evidence of extravasation in Mr. Nance's medical records:

> There's no evidence under very controlled circumstances *with smaller volumes and less pressure*. I have no argument with the fact that a skilled clinician could insert a small IV in Mr. Nance. *I have a great deal of concern that the IV would be less stable under the conditions we would see under an execution.*

*Id.* (emphasis added). Contrary to the court's mischaracterization, Dr. Waisel was here *distinguishing* between the circumstances under which IV access is obtained during routine medical procedures versus executions and emphasizing that his testimony pertains to the latter.

39

Next, the court asserted that Dr. Waisel "admi[tted]" that "if he needed to obtain IV access on Plaintiff, he would attempt to obtain it via peripheral IV on Plaintiff's upper arm." D.163:18 n.8 (citing D.148:146). The court claimed that this "admission . . . tempers Dr. Waisel's opinion that any attempt to obtain a peripheral IV would be substantially likely to fail." *Id.* The court again grossly mischaracterized Dr. Waisel's testimony. Here is the actual exchange:

> Q. Dr. Waisel, if Mr. Nance was your patient and you had to obtain IV access, would you attempt a peripheral IV or would you go straight to a central line?
>
> A. Neither. I would do a peripheral IV with an ultrasound, and I would do it on his upper arm.

D.148:146. The court ignores that Dr. Waisel said he would use an ultrasound. In contrast, the Anonymous Physician responsible for IV access during State executions testified that he has not used an ultrasound in any prior execution, nor would he use one if one were available to him. *See* D.150:30.

40

**C.   The court erred when it relied on facially deficient last-minute testimony from Dr. Antognini to counterbalance Dr. Waisel's testimony.**

The court further erred when it credited Dr. Antognini's testimony arising from his last-minute examination. As discussed in Section I, *supra*, Dr. Antognini should not have been permitted to testify regarding his courthouse examination at all, and the district court's decision to permit the testimony itself constitutes clear error warranting reversal. Worse still, the court ignored the obvious and self-admitted shortcomings of Dr. Antognini's examination. In response to Dr. Waisel's testimony on the tortuousness of Mr. Nance's veins, Dr. Antognini was inconsistent: he first suggested that Mr. Nance has "a lot of straight veins" on his hand and "those are not tortuous in him," D.148:49, but then acknowledged the next day during his rebuttal testimony that "obviously not all of these veins are straight, but you can straighten them out by putting traction on them," *id.* at 122. He then walked back his testimony still further by confirming that he had not actually tried to put traction on Mr. Nance's veins at all. *Id.* at 127.

In response to Dr. Waisel's testimony on the visible scarring on Mr. Nance's veins, Dr. Antognini suggested that the scarring can't be significant

41

because Mr. Nance's blood drained out of his veins when he squeezed Mr.
Nance's arm and then released it. D.147:186-87. As an initial matter, Dr.
Antognini failed to use a tourniquet during the exam, which would have been
necessary to "mimic[] normal clinical circumstances and what would happen
during an execution." D.148:142-43. Dr. Antognini opted instead to simply
squeeze Mr. Nance's arms with his hand, *id.* at 133. This would necessarily
produce limited results: while "[a] tourniquet provides uniform pressure once
it's applied . . . the squeezing may vary in pressure," and while "the
tourniquet applies similar pressure all the way around the arm," squeezing
does not. *Id.* at 145-46 (Waisel). Furthermore, as Dr. Waisel explained, "you
can have drainage while scar tissue is still present, which impedes the
insertion of an IV catheter. So this is not informative." D.148:141; *see also id.*
at 90 (Waisel: "[C]learly people who have scars in their [] blood vessels, are
having blood flow through it. Having blood flow . . . does not predict that you
are able to insert an IV catheter[.]"). And Dr. Antognini again demonstrated
the limited probative value of his physical examination by admitting that
"you need to physically touch the veins to be assured" they are not scarred,
*id.* at 132, while simultaneously acknowledging that he was "not sure [he] felt

42

all of them, no," *id.*, during the examination. The court plainly erred to the extent it viewed Dr. Antognini's haphazard testimony on the compromised state of Mr. Nance's veins as any sort of counterweight to Dr. Waisel's well-grounded testimony on the same subject.

### D. The court erred when it found that the absence of information in largely immaterial medical records outweighed Dr. Waisel's testimony.

Rather than engage with Dr. Waisel's testimony about the risks inherent to obtaining IV access of Mr. Nance under execution conditions, the court instead focused on limited medical records from prior medical procedures during which IV access was obtained. D.163:16-18. According to the court, these medical records show that medical professionals can obtain IV access on Mr. Nance with minimal risk of complication. But as Dr. Waisel explained during trial, the records "do not contain basic core information that we need to predict what the IV access [during an execution] would be like," D.147:101 (Waisel), and are of limited utility in determining the state of Mr. Nance's veins for the purposes of lethal injection.

The records of the February 2022 colonoscopy, for instance, are missing the "number of [IV] attempts, the size of the catheters used, the size of

catheters successfully inserted and were there any problems with it." *Id.* at 102 (Waisel); *see also* J-19. Furthermore, the liquid pushed into that IV was likely significantly lower than the liquid pushed through an IV during lethal injection. P-1:6. The court relied heavily on the affidavit of a registered nurse (who did not testify) who placed Mr. Nance under sedation for the colonoscopy for the proposition that there were no complications. D.163:16. But, as Dr. Waisel explained, the affidavit "does not provide further specific information" beyond what is present in the records themselves, P-1:6, and also incoherently suggests that the "five-hundred milhliters [sic]" of IV solution that Mr. Nance received during the procedure "is equal to 500 grams." *Id.* at 6-7. Milliliters and grams are not equivalent.

The district court's reliance on a December 2022 CT scan was also clear error. The court again relied on an uninformative affidavit, this one submitted by the attending physician and stating that the scans "do not reveal any concerns regarding the delivery of the contrast[.]" D.163:16 (citing J-18:2). But, as Dr. Waisel pointed out, the physician "would have had no participation [] in obtaining IV access on Mr. Nance," P-01:7, and would have had no way of knowing whether initial or subsequent injections caused

extravasation, the number of attempts, the size of the intravenous catheter, the location of the insertion point, or how much volume of the contrast media Mr. Nance could tolerate. *Id.*

Finally, the court relied on an imaging report and accompanying declaration from a February 2023 MRI with IV contrast—a report that, like the other records, says nothing about the IV insertion, the attempts made, the equipment used, or whether there was an initial or subsequent extravasation. P-01:7-8. Dr. Antognini agreed that Dr. Waisel's descriptions of these medical records and their shortcomings is "an accurate description of what was contained in the reports." D.148:26. At most, they show an absence of *documented* complications during three procedures conducted under different conditions, using different equipment, and with different medical professionals than would be present at Mr. Nance's execution. The court plainly erred when it relied on largely immaterial medical records to supersede Dr. Waisel's expert opinion.

**E.    The court erred when it relied on incomplete evidence regarding the execution team's ability to respond quickly to complications.**

The court went on to find that, even if complications were to arise, "the weight of the evidence presented at trial indicates that the medical professionals at the execution would be able to detect and address it[.]" D.163:18. The court's confidence appears to arise from the testimony of the Anonymous Physician and Nurse, who assured the court that they would be able to recognize and address complications should they arise. D.163:5-8. But the court does not acknowledge a critical—and unrebutted—deficiency in the medical team's monitoring plan. As Dr. Waisel explained at trial, "the only effective way to detect problems in the IV flow . . . is to gauge the amount of resistance in the tubing." D.147:21 (Waisel); *see also id.* at 105 ("[S]o you can have extravasation with a lot of fluid injected and there still would be very little sign of it and it's the pressure of the syringe that the educated hand can know there's a problem."). But Defendants offload this critical component of the monitoring process to the members of the Injection Team, who are not medical professionals. D.149:171. They receive no specialized training and hold no knowledge on how to detect resistance in IV tubing, D.149:170; what

they should do to respond to extravasation, D.149:183; or even what

extravasation or a leak at an IV site is. D.149:182-83. Nor is there any

evidence to indicate what the medical team would or could do if Mr. Nance

were to receive insufficient amounts of the drugs, leaving him "gasping and

airway obstruction, and the excruciating feeling of suffocation[.]" P-01:4.

Defendants readily admit that there will be no on-site antidote to administer.

D.152:25. At most, the evidence shows that the medical team will be

monitoring the injection site, but aside from the medical team's inchoate

assurance that they can deal with problems as they arise, there is no record

evidence to support the court's finding that complications will be caught

quickly and addressed effectively should they occur in the course of Mr.

Nance's execution.

The court also glided past the extensive testimony at trial establishing

that the medical team relies on non-medical GDC personnel to make key

decisions around administration of the lethal drugs. The Anonymous

Physician, for example, testified that it is the warden who ultimately decides

whether to administer a second set of pentobarbital syringes, D.150:33, and

when to stop attempting peripheral IV access, *id.* at 38. Regarding the

47

potential decision of whether to perform an alternative access procedure beyond a central line, the Anonymous Physician "assume[d]" it would be made by the warden. *Id.* at 40. But the testifying wardens, in turn, placed decision-making authority with the medical team. D.148:189-90 (Emmons); D.149:101, 131, 139 (Ford); *Id.* at 50 (Sellers).

### F. The court erred by concluding that there is no significant risk of pain should a central line be needed.

Dr. Waisel testified that central line placement—which would require placing a catheter directly into one of Mr. Nance's central veins—could result in a collapsed lung (pneumothorax), D.147:119-20, or striking an artery, D.148:80. The risk of accidentally puncturing an artery in clinical settings is between 9 and 15 percent when no ultrasound is used, *id.*, and there is no dispute that the Anonymous Physician would not use an ultrasound even if one was available. D.150:30. The Anonymous Physician acknowledged both risks and even acknowledged that he has "punctured an artery" in a clinical setting before. *Id.* at 65, 94.

The court dismissed these risks based almost entirely on the Anonymous Physician's startling statement that he "has never once been unable to place a central line." D.163:19. But this statement focuses on

48

*ultimately* being able to set a central line, not on whether he's encountered complications in placing central lines—especially without an ultrasound. The medical literature puts the documented rate of complications in placing central lines without an ultrasound at between 6 and 19 percent, depending on the insertion sites. D.147:112 (Waisel). Even at the low end of that rate, the Anonymous Physician must have run into complications hundreds of times in his career. *See* D.150:42 (estimating that he has performed anywhere from 7,000 to 10,000 central lines in his career, though at his deposition he had said 15,000). Any assertion to the contrary ought to have reduced his credibility with the court, not enhanced it. And yet, the court appears to have concluded that the Anonymous Physician's braggadocious statement concludes the matter. The court thus erred by concluding that placing a central line is "not particularly difficult" or risky. D.163:19-20.

In short, the record evidence shows that Mr. Nance's compromised veins put him at substantial risk of severe pain should Defendants attempt to execute him by lethal injection, and the court improperly relied on medical records with limited probative value and mischaracterized Mr. Nance's expert's testimony in reaching the contrary conclusion. The evidence further

shows that the medical team relies on untrained, non-medical staff to initiate and maintain the flow of the lethal injection drugs, is ill-equipped to address complications should they arise, and would turn to non-medical GDC staff to make key decisions in the process. The court erred by downplaying the risk of severe pain based solely on the qualifications of the medical team.

## V.    The District Court Reversibly Erred in Allowing Critical Execution Team Witnesses to Testify Anonymously, Remotely, Without Cameras On, and Under the Supervision of Another Defense Witness.

Assessing the constitutionality of Georgia's Lethal Injection Protocol as applied to Mr. Nance required that he be able to challenge the background, qualifications, and credibility of the defense witnesses who participate in executions, and ultimately that the court, in rendering its decision in the case, also assess their credibility. Yet, in violation of Rule 43 of the Federal Rules of Civil Procedure, the court ruled that four defense witnesses would be allowed to testify anonymously and remotely by video feed, with cameras off, and under the supervision another defense witness who would attest to their identity. Rule 43 demands that all witness testimony "must be taken in open court" unless a federal statute or court rule provides otherwise. Out-of-court testimony is allowed only upon a showing of (1) good cause in compelling

circumstances; and (2) with appropriate safeguards in place. Rule 43(a). The court's failure to follow these procedures in Mr. Nance's trial violated both the Rules and Mr. Nance's due process rights to confront and cross-examine the witnesses against him. *Affiliati Network, Inc. v. Common Sense Beauty, LLC*, 799 F. App'x 773, 776 (11th Cir. 2020) (citing *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970)).

Just weeks before the trial, Defendants emailed the court, requesting that four key witnesses who participate in the lethal injection process—including two physicians, an IV nurse, and an injection team member (collectively the "Execution Team Witnesses")—be allowed to testify anonymously, outside of the courthouse at an undisclosed location, by video feed but without a camera on, with voice warping software, and with only a *defense* witness—Deputy General Counsel for the Georgia Department of Corrections Bryan Wilson—attesting to the witnesses' identity. D.136:6. Mr. Nance objected and proffered alternative protocols for these witnesses, in line with Rule 43 and the practices of federal courts in other execution-method cases. D.121; D.140. Mr. Nance's suggested alternatives attempted to balance the State's interest in protecting the identity of the Execution Team

51

Witnesses with his interest in challenging their credibility and qualifications and the court's own need to assess their demeanor and credibility. Specifically, Mr. Nance requested that the court require the Execution Team Witnesses to testify:

> in person with specific accommodations made to protect their identifying information, including closing the courtroom from the public such that only officers of the Court are present, allowing [them] to testify as Jane and John Does, using the non-public entrance to the courthouse, and an agreement by Plaintiff's counsel not to ask questions which would elicit any of the 'identifying information' under O.C.G.A. § 42-5-36(d)(1) [Georgia's Secrecy Act].

D.121:2-3. In the alternative, Mr. Nance proposed that they testify in the courtroom but behind a screen, an option initially proposed by the Deputy Clerk. *Id.* at 9.

The court verbally rejected Mr. Nance's proposal on the first day of trial, instead granting the entirety of Defendants' request without modification. D.147:9-10. In doing so, the court cited the importance that the Secrecy Act places on the secrecy of identifying information for those who participate in executions and the "potential risks of requiring those individuals to testify in open court." *Id.* at 9. The court then stated that "the state will use and is directed to use appropriate safeguards," and instructed

52

defense witness Bryan Wilson to attest to the witnesses' identities and ensure the witnesses are in a room alone with no electronics other than a computer for video transmission. *Id.* at 9-10. Despite ruling in the defense's favor, however, the court acknowledged that assessing the witnesses' credibility would be more difficult with these procedures. D.147:10.

Mr. Nance then filed a motion for reconsideration. D.140. Before the court ruled, Defendants announced that the witnesses would be willing to testify without voice modulation. D.149:104. As the discussions continued, the court delegated the choice to appear on video to the *witnesses* themselves, asking Defendants' counsel to inquire if they would be comfortable having video on for the judge and/or examining counsel. *Id.* at 106-107. But the court made clear that it would not require the witnesses to do either. *Id.* In the end, two Execution Team Witnesses chose to allow the judge—but not Mr. Nance's examining counsel—to see them, and two Execution Team Witnesses would not allow even the judge to see them. *Id.* at 163 (Injection Team Member testifying with no video); D.150:8 (Anonymous Physician testifying with no video);[5] *id.* at 106-107 (Execution IV Nurse, video for the judge only);

---

[5] Towards the end of the physician's cross-examination, he disclosed that he

53

*id.* at 155 (Examining Physician, video for the judge only).

The court abused its discretion and erred in finding that the Defendants had shown good cause and compelling circumstances to permit these witnesses to testify in such an extreme and unprecedented manner, which hindered Mr. Nance's ability to cross-examine and confront them effectively, and impeded the court's ability as fact-finder to ascertain their credibility. Then, in ultimately ruling against Mr. Nance, the court relied significantly on the testimony of the Execution Team Witnesses, emphasizing their purported experience and reliability throughout its findings. *See* D.163:5-8, 18-21.

## A. Defendants failed to establish "good cause."

Defendants failed to meet their burden of overcoming Rule 43's presumption for in-person testimony. *See, e.g., Capital Inventory, Inc. v. Green*, No. 1:20-CV-03224-SEG, 2023 WL 2731903, at *2-3 (N.D. Ga. Jan. 19, 2023) (defendants' reasons for requesting out-of-court testimony "failed to meet their burden under Rule 43(a)"). Mr. Nance's counsel asserted his right

---

had only been asked by Mr. Wilson if he wanted to have a video feed with the court *and* the examining attorney. D.150:49-51. After a brief recess, the physician agreed to have the video on for the court only, but by then, the examination was nearly complete, as counsel pointed out. *Id*. at 51, 53.

to cross-examine these witnesses in-person with no barrier so that counsel and the court could assess their credibility but offered multiple procedures to protect the witnesses' identities. *Id.* at 7-8. Defendants insisted that the Execution Team Witnesses' likeness must remain completely undisclosed— even from the judge and court staff—and threatened that if required to come to the courthouse, the Execution Team Witnesses might quit and therefore "deprive the Department of Corrections" of their services out of "fear" that their identities would be revealed. D.136:6.

All of Defendants' suggested variances to Rule 43, ultimately adopted by the district court, are disfavored under the plain text of Rule 43 and accompanying case law. Use of video testimony is disfavored generally. *See, e.g.,* Fed. R. Civ. Pro. 43 advisory committee's note to 1996 amendments ("The importance of presenting live testimony in court cannot be forgotten"). If there must be out-of-court testimony, then video transmission is preferred to audio without video images, particularly for important testimony. *See id.*; *see also Parkhurst v. Belt*, 567 F.3d 995, 1003 (8th Cir. 2009) (holding video transmission appropriate for witness as both fact-finder *and* opposing counsel could observe the witness's demeanor through instantaneous transmission);

55

*Warner v. Cate*, No. 1:12-CV-1146-LJO-MJS, 2015 WL 4645019, at *2 (E.D. Cal. Aug. 4, 2015) (similar).[6] Courts also disfavor allowing witnesses to testify from an undisclosed private location. *See*, *e.g.*, *id.* at 4 (holding video testimony must be transmitted from another federal courthouse).[7]

What's more, Defendants offered no basis or evidence for their claim that they would lose members of the execution team if required to testify in person. It was therefore inappropriate for the court to credit it, particularly when Mr. Nance's proposed protocol provided sufficient protection against public visibility or potential identification. *Cf. Capital Inv., Inc.*, 1:20-CV-03224-SEG, 2023 WL 2731903 at *2-*3 (defendants did not support remote testimony request with a declaration from the witness, which they could have

---

[6] The court defended its choice of Zoom over in-person testimony on the basis of post-pandemic technological advancements. D.149:109. But this reasoning ignores the purpose of the federal rule. *See, e.g.*, Fed. R. Civ. P. 43(a) advisory committee's note to 1996 amendments ("The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling."). Many post-pandemic cases reiterate the Rule 43 requirement for in-person testimony, over contemporaneous transmission. *See e.g.*, *Capital Inv., Inc.*, 1:20-CV-03224-SEG, 2023 WL 2731903. Courts continue to emphasize that "[t]here is no technology to date that can substitute for a [factfinder] looking a witness in the eyes." *Ballesteros v. Wal-Mart Stores E., LP*, No. 2:19-CV-881-SPC-NPM, 2021 WL 2917553, at *1 (M.D. Fla. July 12, 2021).

[7] The court never even required the defense to disclose anything about the location until the first witness began to testify. D.149:161.

filed under seal if there were privacy concerns). Indeed, Defendants have a

history of claiming their witnesses will stop participating in the execution

process if required to participate in court proceedings *at all*. For example, in

another Georgia lethal injection challenge, defendants' counsel argued that if

members of the injection team were even deposed, that "haul[ing them] into

court" could impact their willingness to participate in executions in the

future, and the State may be hard pressed to find a replacement. *See Martin*

*v. Oliver, et al.,* No. 1:18-CV-4617, D.120-4, H'ing Transcript at 54 (July 20,

2022). The *Martin* court allowed the depositions to proceed, with protections

in place, and yet Defendants' overstated prediction has not come to pass.

Defendants have been able to conduct an execution since the time of that

ruling.

In contrast, in the case at hand, the court explicitly credited

Defendant's unsupported allegation as a reason to allow the Execution Team

Witnesses to testify out of court with videos off, unless the witness him or

herself happened to choose otherwise. *See* D.147:10. The court's reasoning

ignores the various ways in which the Execution Team Witnesses' identities

could have been protected while still adhering to at least some of the

57

fundamental requirements of witness testimony.

Defendants also argued generally that the witnesses were entitled to protection under Georgia's Secrecy Act, which classifies as a state secret the "identifying information" of any person or entity who participates in or administers the lethal injection. *See* O.C.G.A. § 42-5-36(d). The court credited the importance of protecting identifying information under the Secrecy Act as to why there was a "compelling circumstance" under Rule 43, D.147:9, effectively treating the Secrecy Act as a statutory exception to Rule 43. As this Court has made clear, Georgia's Secrecy Act does not confer a federal privilege, and Defendants' interest in protecting the identities of Execution Team Witnesses is not absolute. *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1340 (11th Cir. 2020); *see also In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 239 (6th Cir. 2016) (rejecting the notion that the court's reliance on Ohio's secrecy statute "federalize[d] the Ohio secrecy law as a common-law privilege for immunity").

Even under the Secrecy Act, every aspect of an individual's identity or information that could somehow lead someone to surmise a participant's identity is not a state secret. Mr. Nance's counsel could have examined the

Execution Team Witnesses in person without revealing their identifying information. In addition, several other witnesses in this case have been participants in—and continue to be participants in—the lethal injection process (such as Mr. Wilson and multiple wardens) and testified with none of Defendants' proposed safeguards.

Moreover, the faces of nearly all the Execution Team Witnesses would be viewable, and have been viewable in the past, by any member of the public who has attended, or may attend in the future, an execution in Georgia—including, potentially, Mr. Nance's counsel. As Mr. Nance alerted the court, at least 150 people have witnessed an execution in Georgia since the current execution protocol was adopted in 2012, and those witnesses are free to share their observations of the Execution Team Witnesses with the rest of the public. *See* D.121:6-7 n. 2; D.140-7 (Dec. of Gerald King, May 21, 2024).

### B. The district court failed to ensure "appropriate safeguards" were in place.

The court's ruling likewise did not ensure that "appropriate safeguards" under Rule 43 were in place for these witnesses' testimony. The court made clear that the only two safeguards required were: (1) Bryan Wilson "be[ing] with the witnesses and attest[ing] that [they] are the individuals to testify,"

59

D.149:106; and (2) the witnesses being alone in a room with no electronics other than the computer they were testifying on. D.147:9-10. These were wholly insufficient.

The Rule 43 Advisory Committee notes for out-of-court testimony instruct that "[s]afeguards must be adopted that ensure accurate identification of the witness and that protect against influence by persons present with the witness." Neither was done here. Instead, the court adopted Defendants' proposition that the witnesses be unseen, unnamed, identified only by Mr. Wilson—who himself was a witness in this case—and supervised by the same witness. Rather than protecting against influence by persons present with the witness, the procedure adopted only made that influence more possible.[8]

Indeed, what purported safeguards were in place immediately fell apart. At least one of the Execution Team Witnesses did not abide by the limited instructions the court *did* give. After the first Execution Team

---

[8] Just weeks before Mr. Nance's bench trial, another federal judge in Georgia issued a scathing 100-page order against many of the same Defendants (among others), holding them in contempt for, among other things, falsifying documents. *See* Contempt Order, *Daughtry, et al. vs. Emmons, Oliver, et al.*, No. 5:15-CV-41 (M.D. Ga. Apr. 19, 2024) (D.484:33, 36, 42-43.

Witness, the Injection Team Member, testified but before the next witness was to testify, the court attempted to double check that the Anonymous Physician did not have any electronics other than the device to testify on, saying "[I] know yesterday [the Injection Team Member] actually still had his cell phone with him, so I want to make sure that this individual won't have his cell phone." D.150:7. Mr. Wilson then assured the court that this was correct. *Id.* However, Mr. Wilson had assured the court of the same thing the prior day with the Injection Team Member. D.149:161-162. There was no way for the court to adequately and independently verify that any of the Execution Team Members were being honest about not having or using additional electronic devices during their critical testimony.

Additionally, the protocol that the court adopted made it impossible for Mr. Nance's counsel to even know what questions to ask the witnesses when assessing the safeguards. For example, after the court confirmed that the prior witness had possessed electronics that he was not supposed to have, Mr. Nance's counsel started questioning the next witness: "Just to confirm that there's nothing else on the computer screen except for the Zoom and there's no other documents or anything like—I don't know what room they're in—

61

written up on a white board or anything like that, and he's not going to communicate with anybody else during the testimony." D.150:7. Unlike in a typical courtroom setting, or even a live transmission with video on, Mr. Nance's counsel could not know what safeguards to check because of the extremely limited information they were provided.

The protocol for the Execution Team Witnesses' testimony that the Defendants proposed, and the district court adopted, was not even close to being the equivalent of the live, in-person testimony that Mr. Nance should have been accorded under Rule 43(a). Defendants did not show any compelling circumstances that were not addressed by Mr. Nance's proposed safeguards. In fact, other federal courts have managed to balance the interests of state departments of corrections and the plaintiff's burden to prove a constitutional violation in execution-method cases without adopting the extreme and unprecedented measures adopted here. *See, e.g., Harbison v. Little*, 511 F. Supp. 2d 872, 886 n.11 (M.D. Tenn. 2007) (execution witnesses testified in-person at the courthouse, behind a screen, with their names withheld from the published opinion); *In re Ohio Execution Protocol*, 860 F.3d 881 (6th Cir. 2016) (execution witnesses testified in person, at the

courthouse, behind a screen, visible to the court and the examining attorney);

D.121-2:4-5 (transcript from *West et al. v. Brewer et al.*, No. CV-11-1409-PHX-

NVW, 2011 WL 6724628 (D. Ariz. Dec. 21, 2011)) (court taking Arizona's

Secrecy Act into consideration, sealing the courtroom from the public for the

testimony of the medical team leader; bringing in the witness through

alternate courthouse doors; and releasing a redacted transcript to the public).

*See also* Order, *Michael Anthony Taylor v. Larry Crawford, et al.*, No. 05-cv-

4173 (W.D. Mo. May 30, 2006) ("An anonymous deposition of John Doe No. 1

will take place . . . at the courthouse in Kansas City, Missouri. Each side will

be permitted to have one attorney present at the deposition.").

## C. Despite the limitations in assessing their credibility, the court relied heavily on the anonymous witnesses' testimony in ruling against Mr. Nance.

By accepting Defendants' suggested protocol to allow the Execution

Team Witnesses to testify outside of the courthouse at an undisclosed

location, with their cameras off, under the supervision of another witness,

and without any identifying information, the ability to properly ascertain the

credibility of witnesses both by Mr. Nance and the court was severely

hamstrung, as the court knew that it would be. Yet a bulk of the court's

decision denying Mr. Nance relief was based on giving complete credence and trust to the testimony of the Execution Team Witnesses, concluding that the "weight of the evidence presented at trial indicates that the medical professionals at the execution would be able to detect [a complication] and address it in a manner that would not cause constitutionally intolerable pain or discomfort." D.163:18. From the very first page of the findings of fact, the court's findings accepted the witnesses' credibility: "[The execution team] nurses are fully qualified to place peripheral IVs and have extensive experience in obtaining peripheral IV access." D.163:3-4. The inability to ascertain the credibility of the witnesses infected the entire trial, as the questions about the substantive medical skills and experience of the medical team and execution team underlie the entire execution process and the ability to handle the complications likely to arise if Georgia attempts to execute Mr. Nance.

The district court's error in disregarding Rule 43 and allowing critical witnesses to testify anonymously, outside of court, under unprecedented procedures with no good cause or appropriate safeguards—and then weighing

64

heavily that testimony in denying Mr. Nance relief—prejudiced Mr. Nance's due process rights and warrants a new trial.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court denying relief.

Respectfully submitted this 26th day of September, 2025.

*/s/ Andrés López-Delgado*

Cory Isaacson
Andrés López-Delgado
American Civil Liberties Union
Foundation of Georgia
P.O. Box 570738,
Atlanta, GA 30357
(770) 415-5490

Matthew D. Friedlander
WEBB DANIEL FRIEDLANDER LLP
75 14th St. NE,
Suite 2450
Atlanta, Georgia 30309
(414) 712-0282

Anna Arceneaux
Victoria Olender Hellstrom
GEORGIA RESOURCE CENTER
104 Marietta St. NW, Suite 260
Atlanta, GA 30303
(404) 222-9202

65

## CERTIFICATE OF COMPLIANCE

This brief complies with Federal Rule of Appellate Procedure 32(a)(5), (6) because it has been prepared in Century Schoolbook 14 point, a proportionally-spaced typeface, using Microsoft Word word-processing software. This brief also complies with the word limitation of Rule 32(a)(7)(B)(i) because it contains 12,868 words, excepting those portions from the word count under Rule 32(f).

*/s/ Andrés López-Delgado*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing **Plaintiff-Appellant's Brief** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all attorneys of record.

This 26th day of September, 2025,

*/s/ Andrés López-Delgado*