No. 25-11890

In the

# United States Court of Appeals
## for the Eleventh Circuit

Michael Wade Nance,

*Plaintiff-Appellant,*

v.

Commissioner, Georgia Department of Corrections, et al.

*Defendant-Appellees.*

On Appeal from the United States District Court for the
Northern District of Georgia, Atlanta Division.
No. 1:20-cv-00107 — J.P. Boulee, *Judge*

## RESPONSE BRIEF OF DEFENDANT-APPELLEES

| | |
|---|---|
| Beth A. Burton | Christopher M. Carr |
| *Deputy Att'y General* | *Attorney General of Georgia* |
| Clint C. Malcolm | Stephen J. Petrany |
| *Senior Assistant Att'y General* | *Solicitor General* |
| Sabrina D. Graham | Elijah J. O'Kelley |
| *Senior Assistant Att'y General* | *Deputy Solicitor General* |
| | Eric Young |
| | *Honors Fellow* |
| | Office of the Georgia |
| | Attorney General |
| | 40 Capitol Square, SW |
| | Atlanta, Georgia 30334 |
| | (404) 458-3408 |
| | spetrany@law.ga.gov |
| | *Counsel for Defendant-Appellees* |

*Nance v. Comm'r, et al.*, No. 25-11890

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

American Civil Liberties Union Foundation of Georgia, Counsel for Appellant;

Arceneaux, Anna, Counsel for Appellant;

Baker Hostetler, LLP, Counsel for Appellant;

Balogh, Gabor, Victim (deceased);

Boulee, Jean-Paul, Judge, District Court Judge;

Burton, Beth, Deputy Attorney General, Counsel for Appellees;

Carr, Christopher M., Attorney General, Counsel for Appellees;

Carroll, Vanessa, Counsel for Appellant;

Caudill, Lauren, Federal Habeas Counsel for Appellant;

Christian, Ryan M., Counsel for Appellant in District Court;

Clark, Michael C., Trial Judge, Superior Court of Gwinnett County;

Daniel, Laurie W., Previous Counsel for Appellant in this Court;

Davis, Alixandria, Previous Counsel for Appellant in District Court;

Dunn, Thomas, State Habeas Counsel for Appellant;

Emmons, Shawn, Appellee

C-1 of 3

*Nance v. Comm'r, et al.*, No. 25-11890

Friedlander, Matthew D., Counsel for Appellant;

Georgia Resource Center, Counsel for Appellant;

Graham, Sabrina, Senior Assistant Attorney General, Counsel for Appellees;

Harbin, Ryan E., Counsel for Appellant;

Hopkins, Sharon, Appellate Counsel during resentencing trial proceedings;

Hunt, Jr., Willis B., Federal Habeas Judge;

Hutchins, John P., Counsel for Appellant in District Court;

Isaacson, Cory, Counsel for Appellant;

Jordan, Frank, State Habeas Corpus Judge;

Kammer, Brian, State and Federal Habeas Counsel for Appellant;

López-Delgado, Andrés, Counsel for Appellant;

Leutwyler, Ben, Assistant District Attorney;

Malcolm, Clint, Assistant Attorney General, Counsel for Appellees;

Martin, De'Kelvin Rafael, Intervenor in District Court;

Menk, Jacqueline, Counsel for Appellant in District Court;

Moore, Johnny, Trial Counsel;

Nance, Michael Wade, Appellant;

O'Kelley, Elijah J., Deputy Solicitor General, Counsel for Appellees

C-2 of 3

*Nance v. Comm'r, et al.*, No. 25-11890

Olender Hellstrom, Victoria, Counsel for Appellant;

Oliver, Tyrone, Appellee;

Pearson, Lynn, State and Federal Habeas Counsel for Appellant;

Petrany, Stephen J., Solicitor General, Counsel for Appellees

Porter, Danny, District Attorney;

Rasmussen, Kristen, Previous Counsel for Appellant in this Court;

Salchow, Kirsten, State Habeas Counsel for Appellant;

Sharkey, Kimberly, State Habeas Counsel for Appellant;

Schiefer, Theresa, Assistant Attorney General, Previous State
    Habeas Counsel for Warden;

Watkins, Mitchell, Assistant Attorney General, Previous State
    Habeas Counsel for Warden;

Webb Daniel Friedlander LLP, Counsel for Appellant

Wiley, Phil, Assistant District Attorney; and

Wilson, Edwin, Trial Counsel.

    No publicly traded company or corporation has an interest in
the outcome of this appeal.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

C-3 of 3

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellees do not request oral argument in this case. Plaintiff-Appellant Michael Wade Nance claims the State cannot execute him by lethal injection because establishing IV access places him at a substantial risk of serious harm. The district court rejected Nance's claim, finding IV access during lethal injection will not be a problem because Nance has undergone three separate medical procedures since filing this lawsuit, all of which required IV access but none of which involved complications. Especially given the deference due to the district court's findings, there is little need for oral argument.

i

## TABLE OF CONTENTS

**Page**

Statement Regarding Oral Argument.................................................. i

Table of Authorities ................................................................ iv

Statement of Issues ................................................................. 1

Introduction ........................................................................ 2

Statement of the Case................................................................ 4

Background ......................................................................... 5

    A.  Georgia's Lethal Injection Procedures................................. 5

    B.  Factual and Procedural Background.................................... 8

    C.  Standard of Review ................................................. 18

Summary of Argument ............................................................ 19

Argument ........................................................................ 23

    I.  Nance's execution by lethal injection plainly satisfies the Eighth Amendment.......................................................... 23

        A.  The district court was correct (and certainly did not clearly err) in finding that Nance would not face a substantial risk of serious harm from the condition of his veins. ............................................................... 25

        B.  The district court correctly found in the alternative that death by firing squad would not significantly reduce a substantial risk of serious harm. ................................ 38

    II.  The district court did not abuse its discretion in conducting the trial. ......................................................... 42

ii

# TABLE OF CONTENTS
## (continued)

**Page**

A. The district court did not abuse its discretion in allowing Dr. Antognini to physically examine Nance. ................ 42

B. The district court did not abuse its discretion in allowing execution team witnesses to testify anonymously and remotely. ...................................................................... 50

Conclusion ............................................................................... 56

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arthur v. Comm'r, Ala. Dep't of Corr.*,
840 F.3d 1268 (11th Cir. 2016) .............................................. 18

*Arthur v. Dunn*,
580 U.S. 1141 (2017) .......................................................... 41

*Bao Xuyen Le v. Reverend Dr. Martin Luther King, Jr. Cnty.*,
524 F. Supp. 3d 1113 (W.D. Wash. 2021) ................................. 52

*\*Barber v. Governor of Ala.*,
73 F.4th 1306 (11th Cir. 2023)......................................25, 38, 39

*Baze v. Rees*,
553 U.S. 35 (2008) ...............................................................23, 37

*Brnovich v. Democratic Nat'l Comm.*,
594 U.S. 647 (2021) .............................................................18, 26

*Brooks v. Warden*,
810 F.3d 812 (11th Cir. 2016) ................................................ 24

*\*Bucklew v. Precythe*,
587 U.S. 119 (2019) ...........................................19, 24, 25, 39, 41

*Daughtry v Emmons*,
No. 5:15-CV-41, 2024 WL 1791717 (M.D. Ga. 2024) ............... 54

*Gissendaner v. Comm'r, Ga. Dep't of Corr.*,
779 F.3d 1275 (11th Cir. 2015) .....................................19, 23, 27

*\*Glossip v. Gross*,
576 U.S. 863 (2015) .............................................................. 23

iv

*Gould v. Interface,*
   No. 23-12882, 2025 WL 2798842 (11th Cir. Oct. 2,
   2025) ............................................................................... 47

*Johnson v. Hutchinson,*
   44 F.4th 1116 (8th Cir. 2022) ................................................. 24

*Jordan v. Comm'r, Miss. Dep't of Corr.,*
   947 F.3d 1322 (11th Cir. 2020) ............................................... 51

*Nance v. Comm'r, Ga. Dep't of Corr.,*
   59 F.4th 1149 (11th Cir. 2023) .........................................9, 28, 29

*Nance v. Comm'r, Ga. Dep't of Corr.,*
   981 F.3d 1201 (11th Cir. 2020) ................................................. 8

*Nance v. State,*
   272 Ga. 217 (2000) .................................................................. 8

*Nance v. State,*
   280 Ga. 125 (2005) .................................................................. 8

*Nance v. Ward,*
   597 U.S. 159 (2022) ................................................................. 9

*Nance v. Warden,*
   922 F.3d 1298 (11th Cir. 2019) ................................................. 8

*In re Ohio Execution Protocol Litig.,*
   860 F.3d 881 (6th Cir. 2017) (en banc) ..................................... 24

*In re Ohio Execution Protocol Litig.,*
   946 F.3d 287 (6th Cir. 2019) .................................................. 24

*Owens v. Hill,*
   295 Ga. 302 (2014) .........................................................22, 51, 53

*Peat, Inc. v. Vanguard Rsch., Inc.,*
   378 F.3d 1154 (11th Cir. 2004) .............................19, 42, 43, 51

v

*Price v. Comm'r, Dep't of Corr.*,
  920 F.3d 1317 (11th Cir. 2019) .................................2, 24, 39, 41

*Sapuppo v. Allstate Floridian Ins. Co.*,
  739 F.3d 678 (11th Cir. 2014) ............................................18, 30

*Thomas v. Anderson*,
  912 F.3d 971 (7th Cir. 2018) .................................................... 51

*United States v. Carrasco-Salazar*,
  494 F.3d 1270 (10th Cir. 2007) ............................................... 48

*United States v. Gates*,
  807 F.2d 1075 (D.C. Cir. 1986)................................................ 44

**Statutes & Rules**

O.C.G.A. § 42-5-36 ...................................................................50, 53

Fed. R. Civ. P. 26 ...................................................................42, 43

Fed. R. Civ. P. 37................................................................... 43

Fed. R. Civ. P. 43 ................................................................... 51

Fed. R. Civ. P. 61 ................................................................... 42

## STATEMENT OF ISSUES

1.    Whether the district court clearly erred in finding that, based on the lack of complications with IV access in Plaintiff-Appellant Michael Nance's three recent medical procedures, Nance failed to establish a likelihood of serious pain and suffering during execution, where his claim is that it might be difficult to obtain IV access.

2.    Whether the district court abused its discretion in allowing Defendants' expert witness to physically examine Nance's veins on the first day of trial, when, among other things, Nance's counsel represented to the district court that an interview with the expert resolved his concerns over potential prejudice.

3.    Whether the district court abused its discretion in finding that the need to protect the identities of the Department of Correction's execution team was a compelling circumstance justifying allowing them to testify remotely and anonymously.

1

**INTRODUCTION**

Plaintiff-Appellant Michael Nance claims the Constitution requires the State to execute him by firing squad instead of lethal injection. His basis for that claim is that his veins are in a condition where typical IV access *might* be difficult, which *might* cause complications, which *might* be painful, and that pain *might* be significant. But Nance has the "heavy burden" of proving that lethal injection poses a "substantial risk of severe pain." *Price v. Comm'r, Dep't of Corr.*, 920 F.3d 1317, 1326 (11th Cir. 2019) (quotation omitted). The district court, after a bench trial, found Nance had come nowhere close to carrying his burden. Since filing this litigation, Nance has had three medical procedures, all of which required IV access yet none of which involved complications. Doc. 163 at 15–18. The district court did not *clearly err* in finding that Nance may be executed by lethal injection.

Nance tries to distract the Court with tangential attacks on minor discovery and procedural grounds, but none are even relevant, much less correct. Just as one example, Nance takes issue with how the district court "characterized" his expert's testimony. OpeningBr.39–40. But even setting aside the deference due to the district court, it is hard to understand what

2

the distinction is between the court's characterization of the testimony and Nance's own description. Plus none of it matters anyway, because it was not material to the court's (plainly correct) finding about Nance's medical records.

Nance's primary tactic, no more relevant than the rest, is to challenge the district court's decision to allow Defendants' expert witness, Dr. Joseph Antognini, to examine Nance's veins on the morning of the trial, outside the usual time for expert discovery. As Nance tells it, he was then forced to react "on the fly." Opening.Br.12. That supposedly prejudiced him because he "and his expert … had no opportunity to meaningfully rebut Dr. Antognini's opinions." *Id.*

Inexplicably, Nance omits that the district court offered him plenty of options for interrogating and responding to Dr. Antognini, and *Nance turned them down.* The district court told Nance that if he needed "additional relief" to mitigate any potential difficulty in responding to Dr. Antognini, the court would consider a follow-up rebuttal report from Nance's expert or even a "follow-up deposition of Dr. Antognini." Doc. 147 at 8–9. Nance instead asked for a long lunch break to interview Dr. Antognini and then told the court that "based on" the interview he did not "think that any further deposition or reports will be necessary."

*Id.* at 115.  Nance cannot credibly argue that he was prejudiced by having "no opportunity to meaningfully rebut Dr. Antognini's opinions," Opening.Br.12, when he affirmatively turned down those opportunities because his interview of Dr. Antognini "accomplished what [he] needed," Doc. 147 at 115.  Nor can he maintain that he didn't know Dr. Antognini's testimony until he heard it "in open court," Opening.Br.25, when he interviewed Dr. Antognini ahead of time for the specific purpose of learning his testimony.

Nance points to other minor complaints but none are meritorious and all are irrelevant.  This is a basic factual review case.  Nance says he can't be executed by lethal injection because establishing IV access poses a substantial risk of severe pain.  But the district court specifically found: "In light of [Nance's] recent medical history, the Court concludes that Plaintiff failed to show by a preponderance of the evidence that his veins are so compromised that it is substantially likely that the execution team would be unable to obtain peripheral IVs."  Doc. 163 at 18.  This Court should affirm.

## STATEMENT OF THE CASE

Years after being sentenced to death, Nance filed a § 1983 action claiming that lethal injection would violate the Eighth

Amendment's prohibition on cruel and unusual punishment as applied to him and that state officials must instead execute him by firing squad. *See* Doc. 1; Doc. 58. After a bench trial, the district court ruled that Nance's claim fails. Doc. 163.

## BACKGROUND

### A.  Georgia's Lethal Injection Procedures

Georgia's lethal injection procedures provide for execution by an overdose of pentobarbital. An inmate receives two doses of 2.5 grams of pentobarbital—ten times the amount required to render a person unconscious. Doc. 58 at 35; Doc. 147 at 150. That typically induces unconsciousness within 20 to 30 seconds. Doc. 147 at 214. An additional injection of saline ensures that the pentobarbital is completely delivered by clearing any remaining fluid from the injection tube. *Id.* at 204; Doc. 58 at 35.

A team of medical professionals and security personnel conduct the execution. Doc 58 at 31. At least two physicians are present: the lead supervising physician and a physician to pronounce death. *Id.* A third physician may be present to further assist. Doc. 150 at 115. An IV Team of "two (2) or more trained personnel, including at least one (1) Nurse," are there to "provide intravenous access." Doc. 58 at 31. A separate "Injection Team" of three "trained staff members" is there to inject the pentobarbital

5

and saline into the "intravenous port(s)" provided by the IV Team. Doc. 58 at 31; *see also* Doc. 149 at 17.

Members of the execution team train extensively—both periodically and in the days leading up to the execution—and take part in roleplaying exercises simulating each step of the protocol. Doc. 149 at 19–22, 25–27, 167–68.  On the day of the execution, team members arrive hours in advance to prepare and inspect the equipment.  Doc. 150 at 68, 102, 115.  Within an hour of the scheduled execution time, the execution team offers the inmate a "mild sedative."  Doc. 58 at 33; *see also* Doc. 150 at 101, 147.

About 20 minutes before the scheduled execution time, the execution team escorts the inmate to the execution chamber, secures him to the gurney, and the IV team establishes peripheral IV access.  Doc. 58 at 34.  Peripheral IV access occurs most often in the arms.  Doc. 147 at 93.  Once the IVs are placed, they are gently flushed with saline to test that they are working properly. Doc. 150 at 74.  Where peripheral IV access cannot be obtained, "a Physician will provide access by central venous cannulation or other medically approved alternative."  Doc. 58 at 34.  A central venous cannulation, or "central line placement," starts with a "local anesthetic" that reduces any pain, Doc. 150 at 57, 87–88, and it involves the insertion of an IV catheter into one of six

6

possible injection cites: a patient's left or right "internal jugular, subclavian, or femoral veins," Doc. 147 at 92.

During the injection of the pentobarbital, "an IV nurse will monitor the progress of the injection … to ensure proper delivery of chemicals and to monitor for any signs of consciousness." Doc. 58 at 35. The nurse stands beside the inmate during this time to monitor the IV flow, and a physician monitors the IV drip speed from elsewhere in the execution chamber. Doc. 150 at 126–28. If an issue arises with the IV flow, the nurse informs the attending physician, who then informs the Warden as to whether using an alternative method of IV access is appropriate. Doc. 58 at 35. The Warden then "will give the appropriate instructions to the Injection Team." *Id.* If the inmate continues to show signs of life after death should have occurred, the Warden instructs the Injection Team to administer an additional 5 grams of pentobarbital followed by 60 cubic centimeters of saline. *Id.*

One potential complication that may arise during IV access is extravasation. Extravasation is the leakage of fluid into the soft tissue surrounding the veins. It is more likely (although not certain) to happen when a person's veins are scarred, tortuous, or lacking in stability. Doc. 147 at 96–99. The speed of the fluid being injected also impacts the likelihood of extravasation: the

slower the speed, the less the risk. *Id.* at 206. Georgia's lethal injections involve an amount of fluid that is injected at a slower rate than many procedures. *Id.* at 145. If extravasation does happen, it could possibly cause pain and slightly prolong an execution, Doc. 147 at 99, but it is something a physician or nurse can typically handle with "mild compresses," "hot towels," and "elevation," *id.* at 149; *see* Doc. 150 at 144.

### B.  Factual and Procedural Background

**1.** In 1993, after robbing a bank at gun point, Nance stole a car and shot the driver to death. *Nance v. State*, 272 Ga. 217, 217–18 (2000). He was convicted of murder and eventually sentenced to death. *Nance v. State*, 280 Ga. 125, 125 (2005).

Nance filed a federal habeas petition, which failed. *Nance v. Warden*, 922 F.3d 1298 (11th Cir. 2019). Nance then filed this § 1983 action in the Northern District of Georgia, challenging Georgia's lethal injection procedures facially and as applied to him. Doc. 1. After the district court dismissed Nance's complaint as time-barred, Doc. 26, this Court held that Nance's complaint should have been construed as a habeas petition and dismissed as second or successive, *Nance v. Comm'r, Ga. Dep't of Corr.*, 981 F.3d 1201, 1211–14 (11th Cir. 2020). But the Supreme Court reversed, holding Nance's claims were properly asserted under

8

§ 1983. *Nance v. Ward*, 597 U.S. 159, 163 (2022). On remand, this Court held that Nance's as-applied claims were timely, but his facial claims were not. *Nance v. Comm'r, Ga. Dep't of Corr.*, 59 F.4th 1149, 1155 (11th Cir. 2023).

Nance then filed an amended complaint. Doc. 58. He asserted, again, that Georgia's lethal injection procedures violate the Eighth Amendment as applied to him. Nance claims his veins are heavily scarred and tortuous, making peripheral IV access likely to cause extravasation, resulting in severe pain directly or in a central line placement that would be severely painful. *Id.* at 1–2, 12–15. In place of lethal injection, Nance alleges that execution by firing squad is an alternative method that would "substantially lower [the] risk of pain and suffering." *Id.* at 24.

After Nance filed his amended complaint, the parties conducted depositions and discovery, *see, e.g.*, Doc. 108, 132, and the district court set the matter for a bench trial, Doc. 112. About two weeks before trial, the district court's deputy clerk emailed counsel about various trial logistics. *See* Doc. 136 at 8–9. Two relevant disputes arose out of those email exchanges.

*First*, there was an issue regarding experts. Defendants retained Dr. Antognini and Nance retained Dr. David Waisel as experts to testify about how lethal injection procedures would

9

interact with Nance's veins. Both witnesses provided opposing counsel with initial and rebuttal reports and were deposed. Doc. 93; Doc. 94; Doc. 96; Doc. 97; Doc. 132-21; Doc. 132-22.

Defendants requested to have Dr. Antognini physically examine Nance on the morning of the trial. Nance objected, arguing that the examination would be outside normal expert disclosure timelines because Nance would not know Defendants' expert's opinion ahead of trial. Doc. 136 at 2–3. Defendants argued there could be no prejudice from physically examining Nance's veins when Nance's entire claim is about the condition of his veins. *Id.* at 1.

The district court ruled that Dr. Antognini could physically examine Nance before trial, but it withheld judgment on whether it would permit the expert to testify about his opinion on the state of Nance's veins. Doc. 136-1. On that point, the court informed Nance that he could, at trial or in briefing, object under Rule 26's requirements for expert disclosure. *Id.*

Nance did that, filing on the day before trial a motion to exclude testimony from Defendants' expert stemming from the physical examination. Doc. 135. He argued that the examination was a prejudicial violation of Rule 26. *Id.* at 8–9.

10

At the outset of trial, the district court denied Nance's Rule 26 motion and ruled Dr. Antognini could testify about his examination of Nance. Doc. 147 at 7–8. It noted "that the condition of Mr. Nance's veins [is] one of the key issues in this case," meaning the court "would want as much information from the parties, both of the parties, on that as possible." *Id.* at 7. The court also explained that it "makes sense" to save money on Dr. Antognini flying from California to Georgia twice when he could just do the examination in "conjunction with the trial." *Id.* at 7–8. That "especially" made sense given Rule 1 of the Federal Rules of Civil Procedure directing courts to secure a "just, speedy and inexpensive determination of every action." *Id.* at 8. The court pointed out that "an examination of a plaintiff that claims a medical issue and seeks relief based on it just before trial to know the current condition makes sense." *Id.*

The court acknowledged Nance may face "some disadvantage" by not knowing Dr. Antognini's specific conclusions ahead of time, but concluded there was not "much, if any prejudice, especially given that it's fairly routine in other cases for medical experts to do an exam just before trial." *Id.* at 8. Any prejudice was "the type that can be cured." *Id.* at 82. Nance had "a week or two at least" of "advance notice," and Dr. Waisel could "listen to Dr.

11

Antognini's testimony and respond to it to the extent there's disagreement." *Id.* at 8.  Given "how narrow of an issue it is" (the condition of Nance's veins), the court found Nance "would be able to react … with their own expert during the course of this week's trial in a rebuttal case or otherwise." *Id.* at 9.

Moreover, were there any doubt, the court told Nance that if "he needs additional relief on this point" it would "consider a request that [Nance] be allowed to file a follow-up report by" Dr. Waisel "on the same issue" or even allow a "short follow-up deposition of Dr. Antognini on the topic." *Id.* at 8–9; *see also id.* at 81 (noting options to "rectify" any prejudice "through a deposition, rebuttal report from [Nance's] expert or et cetera").

Nance never took the court up on its offers.  Nance instead requested a "somewhat longer lunch break" for his counsel and Dr. Waisel to talk to Dr. Antognini about what his testimony would be; he would then "decide how we need to proceed from there in terms of any rebuttal evidence that we might not otherwise have been prepared to present." *Id.* at 82.  The court agreed; when it came time for the lunch break, the court asked Nance if "an hour-and-a-half lunch break" would be "enough time for [Nance's] team to both have lunch and interview Dr. Antognini and digest that interview." *Id.* at 114.  Nance said he would request additional

12

time if needed.  *Id.*  The court also asked Nance whether he would like the interview to occur "informally, or would you like to record that conversation in some way."  *Id.*  Nance said they would "meet with him informally and depending on what his findings are, we may ask for something more formal."  *Id.*

After the lunch break, the court asked Nance "about how the break went and if you were able to accomplish what you needed." *Id.* at 115.  Nance informed the court that, while purporting not to waive his initial objection, "based on" the "opportunity to informally interview Dr. Antognini" he did not "think that any further deposition or reports will be necessary."  *Id.* at 115. Ultimately, Drs. Antognini and Waisel both examined Nance on the morning of the first day of trial.  *Id.* at 15, 80, 96–97.

*Second*, the parties disputed whether witnesses from Georgia's execution team could testify anonymously and remotely. Doc. 136 at 1–4.  The witnesses included one IV nurse, one Injection Team member, a physician referred to as Dr. Doe, and another physician responsible for examining inmates before executions.  Doc. 150 at 7, 105, 154; Doc. 149 at 162.  The court found "compelling circumstances" to allow anonymous and remote testimony because of "the importance … [of] maintaining the

13

secrecy of" the witnesses' identities and the "risks of requiring [them] to testify in open court." Doc. 136-1 (quotation omitted).

To ensure their authenticity and that they were not being improperly influenced, the court directed that Bryan Wilson, deputy general counsel for the Department of Corrections, would attest to their identities and then leave them alone in a room without any electronics other than the computer through which their testimony was broadcast to the courtroom. Doc. 147 at 9–10; Doc. 149 at 162. The court also allowed the witnesses to decide whether to permit a video feed of themselves to be viewable by the judge. Ultimately, the IV Nurse and the examining physician did allow the video feed, Doc. 149 at 106–07, 163, while the Injection Team member and Dr. Doe testified through audio feed only, Doc. 150 at 8, 106–07. None of them used voice modulation. Doc. 149 at 160.

**2.** The district court conducted a four-day trial, hearing testimony from multiple experts, the execution team members, and several wardens who have overseen executions.

The two medical experts offered dueling opinions. Dr. Waisel testified to Nance's general theory of the case: That Nance's veins were "heavily scarred, heavily tortuous," lacked stability, and were less "elastic," making them "more prone to pressure." Doc.

14

147 at 91, 98. According to Dr. Waisel, that made it more likely Nance's veins will "rupture," causing extravasation. *Id.* at 98. Extravasation, in turn, would be painful and cause the pentobarbital to have no effect, meaning Nance would remain conscious until a physician could establish IV access through another procedure. *See id.* at 99. Dr. Antognini testified to the contrary: that Nance's veins were not heavily scarred and that establishing IV access would not be a problem. Doc. 147 at 186–87. Various witnesses also testified that extravasation, if it did happen, would not be particularly painful and that the execution team could quickly treat it. *See, e.g.*, Doc. 150 at 144, Doc. 147 at 149.

The parties also presented as joint exhibits, and both experts testified about, Nance's medical records for three recent medical procedures involving IV access. *See* Joint Exhibits 18–20.[1] Each procedure happened after Nance initiated this litigation: a colonoscopy in February 2022, a CT scan in December 2022, and an MRI in February 2023. *See id.* Each procedure involved

---

[1] These exhibits are not available online but are housed on a USB drive with the district court. The district court has entered an order stating it will forward electronic versions of the exhibits to this Court when this Court requests them. *See* Doc. 171; Order on Sep. 29, 2025.

15

peripheral IV placements, and the MRI and CT scan involved IV contrasts for the specific purpose of making the imaging work. *Id.* Each medical record was accompanied by a declaration from a physician or nurse involved in the procedure explaining that there were no complications with IV placement or contrast delivery. *Id.* Similarly, the colonoscopy record states there was no "redness, swelling, [or] pain" at the IV site, Joint Exhibit 19 at 4, and the MRI record states that "intravenous administration" was "uneventful," Joint Exhibit 20 at 4.

After post-trial briefing, the district court found that Nance did not carry his burden of proof on his Eighth Amendment claim. Doc. 163. The court relied on Nance's medical records to find that there was not a substantial likelihood that peripheral IV access during a lethal injection would cause serious harm. *Id.* at 16–19. As the court put it, "after [Nance] initiated this action, he has had three medical procedures—all of which required peripheral IV access." *Id.* at 16. But Nance's "medical records lack any evidence that there were problems in obtaining peripheral IV access or complications once the peripheral IVs were inserted." *Id.* at 16. After walking through the details of each record, the court rejected Nance's argument that the records didn't have enough information in them about IV access. *Id.* at 17. The court found

16

instead that "the recent medical procedures show that medical professionals successfully established peripheral IV access on [Nance] on at least three occasions in recent years," showing both "the ability" to establish the access and "a lack of complications." *Id.* "In light of this recent medical history," the court found that Nance had not carried his burden of showing either that the execution team would be "unable to obtain peripheral IVs" or "that it is substantially likely that complications would arise." *Id.* at 18.

And even if a complication did arise, the court found the execution team capable of detecting and addressing it "in a manner that would not cause constitutionally intolerable pain or discomfort." *Id.* Finally, the court also ruled, in the alternative, that Nance's challenge to the use of a central line was a facial challenge barred by the statute of limitations, *id.* at 20 n.11, and found that the procedure would not result in a substantial risk of severe pain anyway, *id.* at 19–21.

Nance moved to alter or amend the judgment, arguing that the court erred by not considering evidence about death by firing squad. Doc. 159. The court denied the motion. It reasoned that it didn't need to consider death by firing squad at all because the applicable legal test requires satisfying two prongs that can be addressed in any order, and Nance failed the first one. Doc. 162 at

17

1–8.  In the alternative, the court did assess death by firing squad, finding that both it and lethal injection would quickly render a person unconscious, making any difference in the level of pain between the two methods "marginal," if it exists "at all."  Doc. 162 at 11.[2]

### C.  Standard of Review

This Court reviews for clear error a district court's factual findings under the *Baze-Glossip* test.  *Arthur v. Comm'r, Ala. Dep't of Corr.*, 840 F.3d 1268, 1301 (11th Cir. 2016), *abrogated on other grounds by*, *Bucklew v. Precythe*, 587 U.S. 119 (2019).  When reviewing a district court's findings for clear error, an appellate court "may not reverse" so long as "the district court's view of the evidence is plausible in light of the entire record."  *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 687 (2021).  Similarly, this Court reviews only for abuse of discretion a district court's evidentiary and trial management decisions.  *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1159 (11th Cir. 2004).

---

[2] Nance also claimed that his use of a drug called gabapentin would block the effect of pentobarbital, a claim which the district court also rejected.  Doc. 163 at 21–22.  Nance has not challenged the district court's ruling on the gabapentin claim, thus abandoning the claim.  *See, e.g.*, *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).

## SUMMARY OF ARGUMENT

Nance's claim fails in every conceivable way.  Nearly all of his arguments on appeal are irrelevant because he barely engages with the medical records that singlehandedly defeat his claim. But either way, Nance offers nothing meritorious.

**I.A.** Nance's claim requires him to show at the threshold that lethal injection places him at a substantial risk of serious harm. *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1275, 1283 (11th Cir. 2015).  His theory is that his veins are in a condition making the IV access needed for lethal injection unconstitutionally risky because there may be complications.  But Nance has undergone three medical procedures since filing this lawsuit that required IV access—and none of them had complications.  *See* Joint Exhibits 18–20.  Consistent, successful, easy IV access cannot possibly support Nance's claim that IV access creates a substantial risk of a "[cruel] superaddition of terror, pain, or disgrace."  *Bucklew*, 587 U.S. at 133 (alterations and quotations omitted).  That is what the district court found, Doc. 163 at 15–18, and it was not clearly erroneous.

Nance has surprisingly little to say about his medical records. *See* Opening.Br.43–45.  He describes them inaccurately, insisting they cannot be informative because they don't have enough details

about IV access. *Id.* That's an empty critique—especially where he has the burden of proof. Regardless, the medical records call IV administration "uneventful," Joint Exhibit 20 at 4, or not resulting in redness, pain, or swelling, Joint Exhibit 19 at 4. Nance's own expert admitted those records indicate no extravasation and successful IV access on the first try. Doc. 147 at 136–37. That forecloses Nance's premise that his veins cannot support IV access.

But even if IV access did cause complications, the complications would still not involve the required level of severe pain. Nance points to extravasation, Opening.Br.36–39, but the pain associated with it is "[n]o more [painful] than being stuck" by an IV needle, Doc. 150 at 144, and something the execution team would quickly treat, *id.*; Doc. 147 at 149. Nance also insists that associated pain could conceivably be the feeling of suffocation, Opening.Br.47, but his own expert testified that was "very, very rare," Doc. 147 at 154. That's not a substantial risk.

**B.** Even if Nance could show that lethal injection creates a substantial risk of severe harm, he can't show that execution by firing squad significantly reduces that risk. For one, getting shot to death potentially involves "significant pain" because a bullet from the firing squad will inevitably sever the person's spinal

20

cord.  Doc. 147 at 222.  But even assuming a person shot to death becomes unconscious before feeling the pain, that just means the method functions similarly to lethal injection.  As the district court found, both methods would result in a person quickly becoming unconscious, making the difference "marginal, if any difference exists at all."  Doc. 162 at 10–11.  That finding was correct, not clear error.

**II.** Failing on the law and evidence, Nance tries to poison the well by challenging two of the district court's decisions in conducting the trial.  Neither challenge has merit.

**A.** Nance challenges the district court's decision to allow Dr. Antognini to examine Nance's veins on the morning of the trial. Opening.Br.11–27.  Despite trying to paint Defendants as the villains, Nance himself veers close to outright dishonesty by inexplicably omitting all the relevant details about this episode. Nance argues that he "had no opportunity to meaningfully rebut Dr. Antognini's opinions" because he did not hear them until they were "delivered in open court."  Opening.Br.12, 25.  But nowhere does Nance mention that the district court gave him the opportunity to conduct an additional deposition or file a supplemental rebuttal report.  Doc. 147 at 8–9, 81.  Nor does Nance mention that, to learn what Dr. Antognini's testimony

21

would be, he asked to interview Dr. Antognini—specifically off the record—and then represented to the court that the interview was sufficient and that a rebuttal report or deposition would not be needed. *Id.* at 114–15. Nance's argument here is waived, wrong, and irrelevant—certainly he identifies no abuse of discretion.

It does not matter to the outcome, however, because Dr. Antognini's examination consisted of wrapping his hand around Nance's arm, raising it, letting go, and looking at Nance's veins. This was not the kind of thing that Nance's counsel or Dr. Waisel would have needed weeks to respond to—indeed, Nance's brief relies on the very same critiques Dr. Waisel made at trial. Opening.Br.41–43.

**B.** Nance also challenges the district court's decision to allow Georgia's execution team members to testify anonymously and remotely. Opening.Br.50–65. But Georgia has "obvious" interests in protecting the identities of those witnesses to protect them from harassment and to make sure they remain willing to participate in executions. *Owens v. Hill*, 295 Ga. 302, 316–17 (2014). That is more than sufficient justification for remote and anonymous testimony. And the district court implemented adequate safeguards, having the deputy general counsel for the Department

22

of Corrections attest to the witnesses' identities before leaving them alone in a room to testify.  Doc. 149 at 106.

This Court should affirm.

## ARGUMENT

### I. Nance's execution by lethal injection plainly satisfies the Eighth Amendment.

To succeed in an Eighth Amendment challenge to a lethal injection protocol, a prisoner must satisfy what is often called the *Baze-Glossip* test.  *Gissendaner*, 779 F.3d at 1283; *see also Glossip v. Gross*, 576 U.S. 863 (2015); *Baze v. Rees*, 553 U.S. 35 (2008) (plurality opinion).  That requires him to show both that "(1) the lethal injection protocol in question creates a substantial risk of serious harm, and (2) there are known and available alternatives that are feasible, readily implemented, and that will in fact significantly reduce the substantial risk of severe pain." *Gissendaner*, 779 F.3d at 1283 (quotation omitted).  "[T]he conditions presenting the risk must be sure or very likely to cause serious illness and needless suffering."  *Id.* (quotation omitted). The prisoner must also show more than merely some pain; he must show the process will "intensif[y]" the death sentence with a "superaddition" of "terror, pain, or disgrace."  *Bucklew*, 587 U.S. at

133 (alterations and quotations omitted). "Death-row inmates face a heavy burden." *Price*, 920 F.3d at 1326.

Nance tries to reinvent the *Baze-Glossip* test, insisting courts must address the second *Baze-Glossip* element even if a plaintiff fails to satisfy the first. *See* Opening.Br.28–36. That would transform a distinct two-part test into a single amorphous "what causes less pain" test. But just as with nearly every multi-prong legal test, a plaintiff can succeed under *Baze-Glossip* only if he can "prove *both* prongs of the test." *Brooks v. Warden*, 810 F.3d 812, 819 (11th Cir. 2016) (emphasis added) (quotation omitted). Logically, a plaintiff's "failure to satisfy *Glossip*'s first prong necessarily means that he cannot" satisfy the second. *In re Ohio Execution Protocol Litig.*, 946 F.3d 287, 291 (6th Cir. 2019); *see also Johnson v. Hutchinson*, 44 F.4th 1116, 1120 (8th Cir. 2022); *In re Ohio Execution Protocol Litig.*, 860 F.3d 881, 890 (6th Cir. 2017) (en banc). Nance relies on language from *Bucklew* describing the *Baze-Glossip* test as a "comparative exercise," Opening.Br.29 (quoting *Bucklew*, 587 U.S. at 136), but a cursory read of *Bucklew* shows that language imposes a *greater* burden on plaintiffs, not a lesser one. The Supreme Court held that execution methods cannot be *invalidated* by being examined "in a vacuum, but only by comparing that method with a viable

24

alternative." *Bucklew*, 587 U.S. at 135 (alteration and quotation omitted). Nance's position is foreclosed anyway because this Court has itself addressed the substantial risk of serious harm prong, expressly without reaching the second part of the test. *See, e.g., Barber v. Governor of Ala.*, 73 F.4th 1306, 1318–19 & n.18 (11th Cir. 2023).

In any event, the district court found both that lethal injection doesn't pose a substantial risk of serious harm, Doc. 163 at 23, and that execution by firing squad would only be, at best, marginally less painful than a lethal injection, Doc. 162 at 11. Neither conclusion was clear error.

### A. The district court was correct (and certainly did not clearly err) in finding that Nance would not face a substantial risk of serious harm from the condition of his veins.

Nance asserts that his veins are so scarred that establishing ordinary IV access will be extraordinarily complicated, and that the complication will result in severely painful extravasation or the need for central line placement, which will itself be severely painful. *See* Opening.Br.36–39, 48–50. But the district court found that Nance has undergone three recent medical procedures where IV access was established without a hitch, so Nance "failed to show … that his veins are so compromised that it is

substantially likely that the execution team would be unable to obtain peripheral IVs," or that a "complication[] would arise causing him severe pain." Doc. 163 at 18. That finding is correct, at the very least "plausible," *Brnovich*, 594 U.S. at 687, and entirely sufficient to resolve this appeal.

**1.** The district court was right that Nance's medical records end this case. For instance, the record from Nance's colonoscopy states there was no "redness, swelling, [or] pain," Joint Exhibit 19 at 4, and that Nance was administered his first IV drug within 20 minutes of arriving in the operating room (suggesting a lack of complications), Doc. 147 at 188–89. Even Dr. Waisel admitted the record indicates no extravasation occurred. *Id.* at 136–37. Nance also received a CT scan and an MRI, both of which required IV injections, and both of which occurred less than two years before trial. Doc. 147 at 33. Neither involved complications. Indeed, the MRI record expressly states that "images of the brain were obtained prior to and following the uneventful intravenous administration" of a contrast. Joint Exhibit 20 at 4.

Notably, for both the MRI and CT scans, successful delivery of the IV contrast was crucial because it was necessary for the imaging to work. As the two physicians who reviewed the images testified, had there been problems with the IV delivery, it "would

26

have been evident in the … scan images." Joint Exhibit. 18 at 2; Joint Exhibit 20 at 2. The CT scan is also notable because the amount of IV fluid used was the same as the amount of pentobarbital used for a lethal injection, and the speed of the injection was "more than twice as fast" as that of a lethal injection. Doc. 147 at 145, 205. That closes the door on Nance's theory because the risk of extravasation is higher when, as in the CT scan, the speed of the injection is higher. *Id.* at 204–05. If there was no extravasation during a procedure with a higher risk profile, there is no reason to believe it will happen during a lethal injection, with a lower risk profile. *Id.* There certainly cannot be a "substantial risk" of it. *Gissendaner*, 779 F.3d at 1283.

That finding alone resolves the entire case, but if the Court were to plow ahead, the remaining evidence is overwhelmingly against Nance as well. For instance, in examining Nance's veins, Dr. Antognini could see the blood flow down Nance's veins easily, which would not have happened if they were heavily scarred. Doc. 147 at 186–87. Dr. Antognini could also see that several large veins in Nance's hand were straight, making it "very easy … to place an IV … in one of those veins." *Id.* at 187. Nance's veins had "no blockage" and "very limited" scarring, and obtaining "[IV] access should not be an issue." *Id.* at 186–87. Similarly, the IV

27

Nurse, who has placed "thousands" of peripheral IVs over 20 years, viewed pictures taken of Nance's hands and concluded Nance's hands had "pretty good veins" and there were probably "better veins between his bicep and his wrist." Doc. 150 at 107, 124, 140.

Even if IV access were somehow difficult, Nance still has no case. His claim is that there may be complications, particularly extravasation. But that has two problems. For one, extravasation is generally "nothing that's excruciating," being no more painful "than being stuck again" by a needle. *Id.* at 144; *see also Nance*, 59 F.4th at 1157 (multiple needle pricks is not an unconstitutional level of pain). Second, the execution team would quickly remedy any extravasation. The IV Nurse stands "at the head of the inmate" to monitor the IV site, while the physicians monitor the flow of the lethal injection. Doc. 150 at 126–28, 134. If extravasation occurs, the IV Nurse would simply "[r]emove the IV," address the issue, and find another IV site. Doc. 150 at 143–44. Nothing about that presents an unconstitutionally high risk of severe pain. On top of *that*, if extravasation or some other complication were to occur during Nance's execution, the execution team could turn to an alternative medical procedure,

28

such as a central line placement.  Doc. 1-1 at 7; Doc. 147 at 92; Doc. 150 at 39–40, 87–88.

Nance attempts to make constitutional hay of the central line placement procedure, but again to no avail.  As an initial matter, Nance's challenge to the central line placement procedure is time-barred.  This Court already held that Nance's § 1983 claims are time-barred insofar as they are *facial* challenges.  *Nance*, 59 F.4th at 1153.  The district court correctly ruled that Nance's challenge to central line placement was facial because it "ha[s] nothing to do with [Nance's] physical condition."  Doc. 163 at 20 n.11.  Any risk of harm to Nance from central line placement does not turn on the state of his veins, but on the general risks anyone would face during a central line placement.  That is not particular to Nance, making it a time-barred facial challenge.  *See Nance*, 59 F.4th at 1153.

And even if the challenge to central line placement weren't time-barred, it would still fail.  As Dr. Antognini testified, any associated pain would be "very minimal."  Doc. 147 at 200.  The pain would come from the initial injection of an anesthetic, which would be about as painful as a "bee sting," and not even a "really bad bee sting" at that.  *Id.* at 200–01.  Dr. Doe, the execution team member who would perform the central line placement, testified

29

that he has never caused a patient a "great deal" of pain while placing a central line.  Doc. 150 at 86–87.  The district court found Dr. Doe "credible," Doc. 163 at 20, which is unsurprising because Dr. Doe has participated in 16 executions (including one where he successfully performed a central line placement), and he has performed over 7,000 central line placements.  Doc. 150 at 17, 35, 41.

In sum: Nance's veins are perfectly capable of handling an IV as they have many times before, but even if they weren't, extravasation or other complications are unlikely, not terribly painful, and easily addressable, and a central line placement is a routine procedure the execution team is experienced with and one that Nance cannot challenge anyway.  The district court certainly did not clearly err here, and the Court should affirm.[3]

**2.** Nance's efforts to show clear error are almost entirely off target, focusing on everything *but* the medical records that dispose

---

[3] In the district court, Nance also challenged two other alternative procedures, a "cutdown" and an intraosseous IV.  *See* Doc. 58 at 16; Doc. 151 at 17–18.  The district court found there was a "very low possibility" either "would be required," and that Nance "failed to demonstrate a substantial likelihood of harm from one of those methods."  Doc. 163 at 19 n.10.  Nance has abandoned on appeal any argument regarding those procedures.  *See, e.g.*, *Sapuppo*, 739 F.3d at 680.

of his case.  Nance's only meaningful argument about his medical records is that they (supposedly) show only "an absence of *documented* complications."  Opening.Br.45.  That is just wrong.

Nance's description of the records isn't accurate.  Nance's MRI, for example, expressly states that the procedure involved "the uneventful intravenous administration" of the IV contrast.  Joint Exhibit 20 at 4.  And his colonoscopy record stated the IV site had no redness, swelling, or pain, Joint Exhibit 19 at 4, which even Dr. Waisel admitted indicates there was no extravasation, Doc. 147 at 136.  Dr. Waisel also admitted the records don't suggest it took more than one time to get IV access.  *Id.* at 137.  And Dr. Antognini noted that if it even took more than two or three tries to obtain an IV, it would "probably be … documented."  *Id.* at 188.  That's not an absence of documentation, that's a documentation of absence.

Nance similarly argues that for his CT scan, the physician would not have been involved in establishing access and "would have had no way of knowing" whether problems arose.  Opening.Br.44–45.  Setting aside that not only physicians contribute to medical records, *of course* a physician would either be aware or be quickly made aware of the kinds of problems Nance claims would lead to him experiencing excruciating pain.  And

31

anyway, Nance is again just wrong: the physician's declaration about the procedure expressly states that the "images do not reveal any concerns regarding the delivery" of the IV contrast, which "would have been evident" had there been IV problems. Joint Exhibit 18 at 2. Regardless, Nance has the weakest of footing to challenge the physician's declarations—his expert Dr. Waisel did not even speak to any of the involved medical personnel because "[t]he lawyers didn't suggest it." Doc. 147 at 137.

Nance lastly attacks the records as unhelpful because they may have involved "different conditions, using different equipment, and with different medical professionals." Opening.Br.45. But that point undermines Nance's case. More variation in the procedures and contexts shows a higher likelihood that IV access will be easily obtained in a lethal injection. And anyway, Nance has pointed to nothing at all to suggest that the "equipment" used in any of the procedures is materially different from Georgia's lethal injection procedures. If anything, the needles used in Nance's colonoscopy were 20 or 22 gauges, which is either the same size or even smaller than the needles used in lethal injections. *See* Doc. 147 at 146–47; Joint Exhibit 19 at 1–2;

Joint Exhibit 15 at 3; *see also* Doc. 148 at 131 (smaller needles are "more difficult to inject drugs through").

**3.** Nance's remaining arguments are picayune, irrelevant, and wrong. For instance, he argues that the district court improperly mischaracterized two points of testimony from his expert, Dr. Waisel. Opening.Br.39–40. Not so—and also it would not undermine the district court's critical findings anyway.

The court's description of Dr. Waisel's testimony is identical to Nance's description in his brief. As to Nance's first quibble, the court explained that "although Dr. Waisel claimed that under the conditions of an execution the IV would be less stable, Dr. Waisel admitted that he had 'no argument with the fact that a skilled clinician could insert a small IV in'" Nance. Doc. 163 at 8 (quoting Doc. 147 at 138). Nance asserts that, somehow, the district court seemed to be equating a small IV and a larger IV necessary for an execution, but the district court was *acknowledging* the difference. It briefly explained that Nance's expert was distinguishing the IV used in an execution from a different type of IV. *Compare id.*, *with* Opening.Br.39. Nance's point goes nowhere.

Next, Dr. Waisel stated that, if required to insert an IV, he would try to establish a peripheral IV through Nance's upper arm, using an ultrasound. The district court explained that this

33

admission "tempers" his "opinion that any attempt to obtain a peripheral IV would be substantially likely to fail." Doc. 163 at 18 n.8. Nance argues that the execution team does not use an ultrasound, Opening.Br.40, but that doesn't undermine the district court's point. Even if Dr. Waisel would use an ultrasound, of course his admission that he would use a peripheral IV "tempers" his objection to the execution team's use of a peripheral IV. And anyway, although unnecessary to meet medical standards of care, the Department has obtained an ultrasound machine that will be available for future executions in the unlikely event one is needed. Doc. 149 at 13, 35–36; Doc. 150 at 31.

Nance also argues that the district court should not have "credited" Dr. Antognini's testimony because it was supposedly inconsistent. Opening.Br.41. Nance, for example, accuses Dr. Antognini of contradicting himself by testifying both that Nance has "a lot of straight veins" and that "not all [of them] are straight, but you can straighten them out." Opening.Br.41 (citing Doc. 148 at 49, 122).

This and similar arguments barely merit a response, but here are two. First, the district court did not rely on this or other expert testimony in any critical way. It found that Nance's

medical records were sufficient to preclude his claim. *See* Doc. 163 at 15–21; *supra* at 16–17. Second, Nance's arguments are facially nonsensical. There is nothing contradictory about Dr. Antognini's statements. A person can have "a lot of straight veins," without "all" of them being straight.

Nance also attacks Dr. Antognini's methods for testing for scarring, but even setting aside that a battle of the experts is not an arena where appellate courts should be reversing district courts, his arguments again fail on their merits. Just as one example: Nance argues that Dr. Antognini should have used a tourniquet, rather than his hand, to examine Nance's veins. Opening.Br.41–43. But Dr. Waisel did not even testify that using a hand to simulate pressure to examine veins is inadequate, he simply testified that using "a tourniquet is what's typically done in clinical circumstances." Doc. 148 at 145.[4]

Nance next challenges the district court's finding that, even if complications arose, the execution team could quickly address

---

[4] Nance's minor quibbles with Dr. Antognini's methods continue, but they become no more relevant or meritorious. For instance, Nance attacks Dr. Antognini for not physically touching all of Nance's veins, but there's no need to physically examine every single vein, especially when Dr. Antognini did see and feel several that would be "very easy" to place an IV. Doc. 147 at 187.

them.  Opening.Br.46–48.  Again, the Court has no reason to get this far because Nance failed to show a substantial risk of any complication happening in the first place.  But Nance is also (again) just wrong about the evidence, not to mention the standard of review.

Nance argues that the Injection Team—the nurses who push the syringes of pentobarbital and saline into the inmate's IV tubing—will not be able to detect signs that extravasation is occurring because they receive no "specialized training" on extravasation.  *Id.* at 46–47.  Nance fails to mention that the nurses regularly handle extravasation in their medical practice, Doc. 150 at 75, 122, 144–45, and that they stand next to a physician who they can ask for help, Doc. 150 at 75, 137, 142, 146.  He does not mention that the nurses test the rate of flow and resistance in each IV tube during IV placement by flushing them with saline, Doc. 150 at 74–75, or that there are a number of other signs of extravasation besides IV resistance, such as "swelling of tissue," or difficulty with the IV tube "draw[ing] blood properly," *id.* at 75.  And Nance ignores Dr. Antognini's testimony that "it would be pretty easy to see extravasation if it was occurring" based on Nance's current weight and the amount of fluid injected during lethal injection.  Doc. 147 at 204.

36

Nance also argues there is no "evidence to indicate what the medical team would or could do if [he] were to receive insufficient amounts of the drugs, leaving him 'gasping and airway obstruction, and the excruciating feeling of suffocation.'" Opening.Br.47. Again, this is all beside the point, and again Nance is just wrong. He never established that an inadequate delivery of pentobarbital would cause "airway obstruction," or "the feeling of suffocation." *Id.* This is not something that happens in procedures involving drugs that operate in a similar way to pentobarbital. Doc. 147 at 215. And there was no evidence for Nance here beyond Dr. Waisel's testimony, who was equivocal at best. He admitted that he had no idea how often those complications might occur, other than his understanding that they are "very, very rare." Doc. 147 at 151, 154. If something is "very, very rare," *id.* at 154, there is not a "substantial risk" that it will happen, *see Baze*, 553 U.S. at 50 (quotation omitted).

Nance's only quibble with the district court's finding on the availability of a central line placement is that the "risk of accidentally puncturing an artery in clinical settings is between 9 and 15 percent when no ultrasound is used." Opening.Br.48 (quotation omitted). That matters in Nance's eyes because Dr. Doe testified that he has never been unable to place a central line

37

in his career of doing between 7 and 10 thousand of them.  *See* Doc. 150 at 43.  Nance says that, given the general rate of complications, Dr. Doe surely "must have run into complications hundreds of times in his career."  Opening.Br.49.

Nance's conclusion doesn't follow from his premise, and his argument is self-defeating.  For one, Nance is conflating his vague use of the term "complications" with the outright inability to place a central line *at all*, and Dr. Doe's testimony was about the latter. *See* Doc. 150 at 43–45.  Regardless, even on its own terms Nance's position is akin to arguing that because (to make up a number) five percent of lawyers engage in malpractice, every lawyer must engage in malpractice five percent of the time.  That's not how statistics work.  Anyway, Nance did not even prove that supposed complications from central line placement would result in severe pain, so as with all of Nance's arguments, it doesn't really matter anyway.  Doc. 150 at 66–67.

## B. The district court correctly found in the alternative that death by firing squad would not significantly reduce a substantial risk of serious harm.

Because he fails at step one, this Court need not address Nance's arguments on the second element of the *Baze-Glossip* test. *See Barber*, 73 F.4th at 1318 & n.18; *supra* at 24–25.  But even if

38

the Court were to consider execution by firing squad, it should hold that the district court did not clearly err in holding that any difference in pain between the two methods "is marginal, if any difference exists at all." Doc. 162 at 10–11.

To succeed on a challenge to a state's chosen execution method, a plaintiff must "identify an alternative feasible method of execution that would significantly reduce the substantial risk of severe pain." *Barber*, 73 F.4th at 1314. A "minor reduction in risk is not enough; 'the difference must be clear and considerable.'" *Price*, 920 F.3d at 1329  (quoting *Bucklew*, 587 U.S. at 143).

Start with the obvious: Being shot is "not a pleasant sensation." Doc. 147 at 54. If anything, death by firing squad is potentially more painful than a lethal injection. Based on his anesthesiologic expertise, Dr. Antognini testified that an inmate would experience "significant pain" from the destruction of the spinal cord. *Id.* at 222. The spinal cord is located directly behind the heart and contains many nerve fibers that run up to the brain. *Id.*; Doc. 148 at 40. Damaging it would create a "barrage of impulses" traveling up to the brain for the duration of time that the inmate is still conscious. Doc. 147 at 222. And the spinal cord would inevitably be shot and severed when a firing squad is

39

shooting an inmate from various angles. *Id.* at 70. That's not *significantly less* pain than lethal injection.

But setting that aside and assuming (wrongly) that being shot to death isn't painful because the inmate would quickly be unconscious, that does nothing to distinguish it from lethal injection. Under a firing squad, Nance would lose consciousness anywhere from "three to four" seconds after a bullet penetrates his heart, *id.* at 58, to "eight to ten seconds," *id.* at 220. By contrast, an inmate executed by lethal injection—suffering the pinprick of a needle injection instead of multiple gunshots—would "peaceful[ly]" lose consciousness within a few minutes. Doc. 150 at 148. In both situations, the inmate is quickly reaching a state of unconsciousness. The district court did not clearly err in finding there is, at most, a marginal difference between the two methods.

Nance has nothing but irrelevant and flawed evidentiary arguments otherwise. At the outset, Nance never actually addresses the court's finding about the marginal difference between firing squads and lethal injections. Doc. 162 at 11. Even accepting *everything* Nance says about firing squad deaths being supposedly painless (which is wrong), so is lethal injection. That is dispositive.

40

At most, Nance asserts that lethal injection has an error rate of "roughly seven percent," whereas "there have been no botched executions under modern protocols in Utah."  Opening.Br.33.  Even accepting that as true, it means Nance loses.  The *Baze-Glossip* test demands that "minor reduction in risk is not enough; 'the difference must be clear and considerable.'"  *Price,* 920 F.3d at 132 (quoting *Bucklew,* 587 U.S. at 143).  An error rate of 7 percent is not a "substantial risk" from which any reduction could be "clear and considerable."  *Id.* (quotation omitted).  But the purported comparison of error rates is deeply flawed anyway.  Execution by firing squad in modern times is exceedingly rare (fewer than 40 examples), whereas lethal injection (the commonplace method) has been performed over a thousand times.  *See* Opening.Br.33 (citing *Arthur v. Dunn,* 580 U.S. 1141, 1154 (2017) (Sotomayor, J., dissenting)).  The sample sizes cannot be compared.  On top of all that, Nance's expert—by his own admission—did not even compare firing squads to lethal injections.  Doc. 147 at 77.

But again: Nance's arguments fail at least a half dozen times before even getting this far.

## II. The district court did not abuse its discretion in conducting the trial.

With no meaningful objections to the district court's substantive determinations, Nance relies primarily on supposed procedural errors. Nance argues that the district court abused its discretion in allowing Dr. Antognini to physically examine Nance on the morning of trial and in allowing members of Georgia's execution team to testify anonymously and remotely. The court did not err; did not abuse its discretion; and certainly did not do anything approaching substantial prejudice to Nance. Fed. R. Civ. P. 61; *Peat*, 378 F.3d at 1162.

### A. The district court did not abuse its discretion in allowing Dr. Antognini to physically examine Nance.

Nance argues that the district court should not have allowed Dr. Antognini to examine Nance's veins on the first day of trial because Defendants did not disclose that plan during the Rule 26 timeline for expert disclosures. Opening.Br.13–18. Nance's argument fails as a matter of law and fact.

As to the law, the federal rules provide district courts extensive discretion over expert discovery and disclosure timelines. Rule 26(a)(2)(B), for example, generally requires that expert witnesses provide opposing parties with a written report

42

containing "a complete statement of all opinions the witness will express," but that provision is expressly tempered by the district court's discretion to order otherwise.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i).  Rule 26(a)(2)(D), similarly, provides that expert disclosures may be made "at the times and in the sequence that the court orders."

On top of all of that, even if "a party fails to provide information … as required by Rule 26(a)," the court may still allow the party to "use that information … at trial [if] the failure was substantially justified or [ ] harmless."  Fed. R. Civ. P. 37(c)(1).  And even if the district court does abuse its discretion, an appellate court can reverse only if the court's decision resulted in "substantial prejudice," looking at "the number of errors, the closeness of the factual disputes (i.e., the strength of the evidence on the issues affected by the error), and the prejudicial effect of the evidence at issue."  *Peat*, 378 F.3d at 1162.

The district court here did nothing improper or even close.  The district court allowed Dr. Antognini to physically examine Nance the morning of the trial.  *See supra* at 10–13.  Dr. Waisel also examined Nance on the first day of trial.  Doc. 147 at 15, 80.  Acknowledging that Nance would have to respond quickly to Dr. Antognini testifying about his examination, the court offered

43

Nance the opportunity to conduct an additional deposition or file an additional rebuttal expert report. Doc. 147 at 81–83. Nance chose to do neither, instead asking to interview Dr. Antognini during a 90-minute lunch break, then reporting back to the court that "based on" the interview no deposition or rebuttal report would be needed. *Id.* at 115. Nance's expert then critiqued Dr. Antognini's methods at length, *see* Doc. 148 at 90, 139, 141, 145–46, and Nance never tried to pursue another deposition or rebuttal report. Everything about that was well within the district court's discretion. Nothing about it was prejudicial.

There is nothing suspect about physical examinations happening during or just before trial. *See, e.g.*, *United States v. Gates*, 807 F.2d 1075, 1081 (D.C. Cir. 1986). It's not hard to see why. Take this case, for example. The issue is the condition of Nance's veins. Obviously, an examination at the beginning of trial is more valuable than one conducted months before—and the district court recognized that. Doc. 147 at 8. That is certainly true of Nance, whose physical condition and the condition of his veins has changed over time from, among other things, weight loss, Doc. 147 at 91, 98, 100, and alleged drug abuse, *id.* at 96–97. Indeed, had Dr. Antognini conducted an examination ahead of time, there is no doubt that Nance would accuse Defendants of

44

marshalling outdated evidence. The more accurate and up-to-date information put before the factfinder, the better.

Nance argues, implausibly, the examination is cause to toss out the entire trial. Even if Nance were right about every factual premise he asserts, his conclusion would still be wrong, but Nance's brief is so tainted by material omissions that, with an honest accounting, his argument is barely colorable.

Nance asserts that he was incurably prejudiced because the "first time" he learned Dr. Antognini's conclusions was "in open court," meaning he and his expert could not adequately cross-examine and rebut Dr. Antognini. Opening.Br.25; *see also id.* at 5, 24. That is simply not true.

Inexplicably absent from Nance's brief is any mention of these material facts: (1) his own expert also examined Nance on the day of trial and testified about it, Doc. 147 at 15, 80, 94; (2) the district court offered Nance the possibility of an additional deposition or rebuttal report, *id.* at 8–9, 81; (3) Nance asked instead to interview Dr. Antognini during a long lunch break to "decide how [Nance's counsel] need to proceed," *id.* at 82; (4) the district court allowed that, *id.*; (5) the district court told Nance it was his counsel's decision whether to have Dr. Waisel participate in that interview, *id.*; (6) the district court offered to have the interview

45

be recorded in some form, *id.* at 114; (7) Nance declined the offer, *id.*; (8) the district court expressly stated the interview would be to determine "if that addresses [Nance's] concerns" about prejudice, *id.* at 82; (9) Nance's counsel did interview Dr. Antognini, *id.* at 115; (10) after the lunch break the district court asked Nance's counsel if they were "able to accomplish what you needed," *id.*; (11) Nance's counsel reported back to the court that "based on" the interview no "further deposition or reports will be necessary," *id.*; (12) Dr. Waisel's rebuttal testimony was not until the day after Dr. Antognini testified about his methods, *compare* Doc. 147 at 186, *with* Doc. 148 at 71; (13) Nance was able to cross-examine Dr. Antognini about his methods the day after Dr. Antognini testified about them, Doc. 148 at 90, 139, 141, 145–46; and (14) Nance never raised the issue again.

Not content with omissions, Nance affirmatively misleads the Court by claiming that Dr. Antognini was allowed to keep "his methods and conclusions" secret "until the testimony was delivered in open court." Opening.Br.25. And: "They were disclosed for the first time on the stand." Opening.Br.5; *see also id.* at 24. Nance's counsel interviewed Dr. Antognini over a 90-minute lunch and reported to the district court that, "based on" that interview, no deposition or rebuttal report would be needed.

Doc. 147 at 115.  The express and specific purpose of the interview was for Nance to learn what Dr. Antognini's testimony would be.  And Nance never objected that Dr. Antognini testified about something wholly separate from what they discussed during the interview.  Yet now Nance represents to this Court that he did not know what Dr. Antognini was going to say "until the testimony was delivered in open court" or "on the stand."  Opening.Br.5, 24, 25.

Setting aside Nance's alternate universe, his argument fails anyway, first of all because he waived it many times over.  His core premise is that he was somehow prejudiced because he and his expert could not possibly have been able to cross-examine Dr. Antognini "on the fly."  Opening.Br.12.  But when he was offered the opportunity for a supplemental deposition or rebuttal report, he affirmatively declined because, "based on" interviewing Dr. Antognini, he didn't "think" it was "necessary."  Doc. 147 at 115.  That is waiver.  *See Gould v. Interface*, No. 23-12882, 2025 WL 2798842, at *4 (11th Cir. Oct. 2, 2025).  And his failure to raise any objection—at trial, in his post-trial brief, in his motion to amend, or any other motion, *see* Docs. 151, 153, 154, 159—is forfeiture.  *See Gould,* 2025 WL 2798842, at *4.  Only on appeal

47

has Nance decided he had "no opportunity to meaningfully rebut Dr. Antognini's opinions." Opening.Br.12.[5]

Regardless, Nance's argument about prejudice disproves that he needed any additional time or was surprised in any way. Despite asserting that there was no possible way to respond to Dr. Antognini during trial, *all* of his attacks on Dr. Antognini's testimony are the same ones Dr. Waisel testified to, disproving the notion that extra time would somehow reveal more supposed flaws in Dr. Antognini's methods. *Compare* Opening.Br.5, 12, 24–26, *with* Doc. 148 at 90, 139, 141, 145–46. Nor did Nance have to respond to Dr. Antognini "on the fly." Opening.Br.12. Both Nance's expert and counsel got to respond the following day. *See* Doc. 147 at 186 (Dr. Antognini's testimony about his methods); Doc. 148 at 71 (Dr. Waisel's rebuttal testimony); *id.* at 127

---

[5] To be sure, Nance *said* he was preserving his objection despite his affirmative waiver. Doc. 147 at 115. But that's like objecting to the admission of certain evidence, the court offering to exclude it, and then saying "well, I'm fine with you letting it in, but I'm preserving my objection." That's no longer an objection. *See, e.g.*, *United States v. Carrasco-Salazar*, 494 F.3d 1270, 1273 (10th Cir. 2007) ("There can be no clearer [waiver] than when the court brings the defendant's prior objection to his attention, asks whether it has been resolved, and the defendant affirmatively indicates that it has.").

(Nance's re-cross examination of Dr. Antognini about his methods).

But those are the trees, and the Court shouldn't miss the forest: *None* of this mattered to the district court's dispositive findings.  Nance says "it is impossible to disentangle the improperly introduced testimony from the rest of the court's findings," Opening.Br.12, but there's nothing to "disentangle" because the district court never tangled it in the first place.  Of course, the bulk of Dr. Antognini's testimony—such as about gunshots, the execution team's qualifications, Nance's medical records, and extravasation generally—didn't depend on his examination of Nance.  But the district court did not rely on Dr. Antognini's testimony anyway.  One need only read what the district court wrote: "In light of this recent medical history, the Court concludes that Plaintiff failed to show by a preponderance of the evidence … that it is substantially likely that the execution team would be unable to obtain peripheral IVs." Doc. 163 at 18.  Dr. Antognini's testimony was not a critical or necessary part of the district court's order, as a cursory reading makes clear.[6]

---

[6] Nance suggests that the "district court's Findings of Fact favorably cite and quote directly from Defendants' expert's testimony regarding his visual and physical examination of Mr. Nance."  Opening.Br.12 (citing Doc. 163 at 11 & n.6).  Nance

Nothing the district court did—including giving Nance the opportunity for additional depositions or supplemental reports— was even a mistake, much less an abuse of discretion. And none of it matters anyway. Nance's veins are perfectly capable of receiving IVs, the district court found as much based on his own medical records, the rest is unnecessary.

## B. The district court did not abuse its discretion in allowing execution team witnesses to testify anonymously and remotely.

The district court allowed members of the execution team to testify anonymously and remotely. *See supra* at 13–14. That decision was completely sensible, indeed required, given that the Georgia Lethal Injection Secrecy Act designates as a state secret the identity of the execution team members. O.C.G.A. § 42-5-36(d)(2). The statute reflects the State's "obvious" interest in "the confidentiality offered to execution participants" because of the need to protect the witnesses from "the risk of harassment" as well as the "significant risk that persons and entities necessary to the execution would become unwilling to participate" if their identities

—————————

neglects to mention that the district court did the exact same thing for Dr. Waisel. The court's "Findings of Fact" section recited both experts' testimony, including Dr. Waisel's directly opposite testimony. Doc. 163 at 8–9.

50

were exposed. *Owens*, 295 Ga. at 316–17; *see also Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1337–38, 1341 (11th Cir. 2020) (adopting that reasoning). The district court plainly did not abuse its discretion in shielding the identity of execution team members, but, as is the common refrain here, it does not matter. The testimony Nance challenges wasn't necessary for the district court's material fact findings or holdings.

Rule 43 allows testimony "by contemporaneous transmission" from outside the courtroom when there is "good cause in compelling circumstances and with appropriate safeguards." Fed. R. Civ. P. 43(a). The safeguards must be enough to "ensure accurate identification of the witness and [to] protect against influence by persons present with the witness." Fed. R. Civ. P. 43, Advisory Committee Note to 1996 Amendment. "Audio transmission without video images may be sufficient in some circumstances." *Id.* Even if a court does abuse its discretion, reversal requires substantial prejudice. *Peat*, 378 F.3d at 1162.

Courts have upheld the use of remote testimony for far less important reasons than protecting state secrets, such as merely saving witnesses from "expense and inconvenience." *Thomas v. Anderson*, 912 F.3d 971, 977 (7th Cir. 2018). And testimony through video platforms like Zoom is now commonplace. *See, e.g.,*

51

*Bao Xuyen Le v. Reverend Dr. Martin Luther King, Jr. Cnty.*, 524 F. Supp. 3d 1113, 1115–16 (W.D. Wash. 2021).

The district court was well within its discretion both to find that protecting the identity of the execution team members presented "compelling circumstances" for remote and anonymous testimony, and to impose the safeguards it chose. The court had Bryan Wilson, the deputy general counsel for the Department of Corrections—the witnesses' employer—attest to each witness' identity before leaving them alone in a room and without any electronics "other than the computer over which the video and audio feed" was broadcast. Doc. 147 at 9–10; Doc. 149 at 162. Each witness confirmed that no one else was in the room with them after he left. Doc. 149 at 163; Doc. 150 at 9, 105–06, 154–55. One witness appears to have mistakenly brought their cellphone in the room, but then immediately relinquished it. Doc. 149 at 164. Two witnesses were allowed to testify via audio feed only, Doc. 150 at 8, 106–07, while two witnesses opted to allow a video feed to be broadcast to the judge. Doc. 149 at 106–07, 163. No witness used voice modulation software. Doc. 149 at 160.

Nance's efforts to undermine the district court's ruling are unavailing. Nance insists, for example, that the district court could not credit Defendants' claim "that they would lose members

52

of the execution team if required to testify in person" because "Defendants offered no basis or evidence" for it.  Opening.Br.56. But of course the court could make that finding, just as other courts have.  *See, e.g.*, *Owens*, 295 Ga. at 316–17.

Nance also argues that the executioners' need for secrecy is illegitimate because people who attend executions (including the death penalty bar) can see the faces of execution team members. Opening.Br.59.  Set aside the false equivalence between the execution chamber and a courtroom, Nance ignores the ways in which the identities of execution team members are shielded during an execution.  The physicians and IV nurses often wear medical masks and two of the witnesses who testified are not even viewable from the execution witness room.  Doc. 136 at 6.

Nance even goes so far as to say that because the wardens testified publicly, there cannot have been any reason for the execution team members to do so.  Opening.Br.59.  But the wardens are public-facing, named defendants, which plainly isn't true of the execution team.  *See* O.C.G.A. § 42-5-36(d)(2).

As to the safeguards the district court imposed, Nance argues the district court should have done things his way—it should have merely closed the courtroom so that "only officers of the Court are present" and allowed the witnesses to use "the non-public

53

entrance to the courthouse." OpeningBr.52 (quotation omitted). Nance also says other courts have done things differently than the district court did. Opening.Br.62–63. But this is a question in the core of the district court's range of discretion, and it was well within that discretion to reject Nance's proposals.

Nance implies the district court's safeguards weren't adequate by insinuating with no support that Wilson must have exercised some outside influence on the witness' testimony. Opening.Br.60. He offers precisely no evidence that Wilson lied about any witness' identity or improperly influenced them. He instead includes a cryptic footnote citing a contempt order from a different case that has no relevance to this one. Opening.Br.60 n.8. That order was about the failure to comply with a settlement agreement, and it never suggests Wilson engaged in affirmative or untruthful misconduct. *Daughtry v Emmons*, No. 5:15-CV-41, 2024 WL 1791717 (M.D. Ga. Apr. 23, 2024). Baselessly insinuating dishonesty on the part of a state official is no substitute for actual evidence—particularly where Nance never objected during any witness' testimony to assert Wilson had acted improperly.

Anyway, the district court credited the witnesses' testimony about their qualifications, medical experience, and ability to

54

handle complications that may arise during an execution. *See* Doc. 163 at 18–20; *see also id.* at 5–8 (reciting testimony). Nance never actually explains what testimony cannot be credited (or was somehow mistaken).

Lastly, for one final time: This appeal can be resolved without even referencing the testimony Nance challenges. *See supra* at 26–27. Their testimony was not necessary to the dispositive conclusion as to Nance's veins, it was not necessary to hold his facial challenge time-barred, it is not necessary for this Court. Nance kicks up much dust. Behind it all, he cannot succeed.

# CONCLUSION

For the reasons set out above, this Court should affirm the judgment of the district court.

Respectfully submitted.

|  | */s/ Stephen J. Petrany* |
|---|---|
| Beth A. Burton | Christopher M. Carr |
| *Deputy Att'y General* | *Attorney General of Georgia* |
| Clint C. Malcolm | Stephen J. Petrany |
| *Senior Assistant Att'y General* | *Solicitor General* |
| Sabrina D. Graham | Elijah J. O'Kelley |
| *Senior Assistant Att'y General* | *Deputy Solicitor General* |
|  | Eric A. Young |
|  | *Honors Fellow* |

Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
*Counsel for Defendant-Appellees*

56

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 11,913 words as counted by the word-processing system used to prepare the document.

/s/ *Stephen J. Petrany*
Stephen J. Petrany

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2025, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Stephen J. Petrany*
Stephen J. Petrany